[No. A055461. First Dist., Div. Two. May 24, 1993.]

ROD R. VIOLETTE et al., Plaintiffs and Appellants, v.
RICHARD L. SHOUP et al., Defendants and Respondents.

**[Opinion certified for partial publication.\*]**

---

 \*Pursuant to rules 976 and 976.1, California Rules of Court, this opinion is certified for partial publication. The portions directed to be published follow.

**COUNSEL**

James H. Seymour for Plaintiffs and Appellants.

Seyforth, Shaw, Fairweather & Geraldson, Sue J. Stott, Rebecca A. Speer and Luanne Sacks for Defendants and Respondents.

**OPINION**

**KLINE, P. J.—**

### Introduction

Plaintiffs Rod and Helene Violette appeal from a judgment of the San Mateo County Superior Court dismissing their action against defendants Richard L. Shoup and ManEquity, Inc., following the court's grant of summary judgment in favor of defendants. Plaintiffs contend the court erred in granting summary judgment. We shall affirm.

### Statement of Facts

This action arose from the failure of plaintiffs' investment in a wind energy tax shelter, Eagle Wind Partnerships, Ltd. (Eagle Wind). Rod Violette, a commercial airline pilot, had for many years engaged in a variety of speculative tax shelter investments.[1] At the time of the Eagle Wind investment, he had passed an exam prescribed by the National Association of Securities Dealers and was a registered representative qualified to sell securities, had attended numerous seminars on tax shelters, had drafted his own prospectus in order to sell speculative oil and gas investments, and had sold partnership interests in speculative ventures. He had been employed for over 10 years preparing tax returns and providing tax and investment advice.

The Violettes annually selected an investment at year-end to substantially reduce their tax liability and wished to do so at the end of the 1984 calendar year. However, Rod Violette believed that previous investments made by the

---

[1]Helene Violette relied entirely on her husband in making the investment in Eagle Wind. Reference to decisions made by Violette indicate decisions made by Rod Violette on behalf of himself and his wife.

two had not proved terribly successful and wanted to obtain professional advice.

The Violettes and Shoup were social acquaintances who lived in the same neighborhood and whose children had been in scouts together. At a chance meeting in a shopping center parking lot in 1984, Rod Violette described his tax practice to Shoup and mentioned that he had invested in and sold tax shelters. Shoup, an independent life insurance agent,[2] saw Rod Violette as a potential source of referrals due to his tax practice clientele and suggested they meet. At their meeting, a few weeks later, Shoup inquired about the Violettes' life insurance needs in hopes of selling them insurance. Violette told Shoup that he did not need life insurance and that he wanted to shelter income for the 1984 tax year. Shoup explained that the only product he sold that sheltered income was IRA's. Violette did not wish to purchase an IRA, stating he wanted a more aggressive tax shelter. Violette asked Shoup if he knew anyone who sold such investments.

In response to Rod Violette's inquiry, Shoup, as a personal favor, said he knew many people who were financial planners, one of whom was Margaret Sciaroni. Shoup had previously met Sciaroni at a seminar, where Sciaroni had presented herself as a financial planner. He had met with her once to talk about the type of services she provided. At the time he introduced the Violettes to her, Shoup did not expect to receive a referral or other fee. He introduced Violette because he was a social acquaintance.

Sciaroni prepared an analysis of the Violettes' financial status based on their 1983 tax return and a budget the Violettes had created. Sciaroni made recommendations about different categories of investments that would shelter the Violettes' income to varying degrees. Her analysis did not identify any specific investment by name and only contained examples of possible investment types and a description of likely tax savings. Sciaroni gave the analysis to Shoup because she had not yet met or talked with the Violettes, and Shoup gave it to the Violettes. When he did so, Shoup did not express any opinion about Sciaroni's recommendations, and was never asked to do so by the Violettes. Shoup made clear from the beginning that he had little experience with the type of tax shelters in which the Violettes were interested. He was never asked to give, and did not offer, any opinion concerning Sciaroni's competency. He merely told the Violettes that he had previously met Sciaroni. The Violettes had no further contact with Shoup before investing in Eagle Wind. Shoup was never asked by the Violettes or by Sciaroni to comment on the investment. In fact, the Violettes did not even tell Shoup about their investment decision.

---

[2]One of Shoup's principals was the Manufacturers Life Insurance Company and its subsidiary, ManEquity, Inc.

The most aggressive tax shelter contained in the analysis Sciaroni prepared for the Violettes was a public wind energy investment offering. However, the Violettes rejected that suggestion because it did not shelter enough income. Instead, the Violettes decided to invest in Eagle Wind, a riskier private wind energy offering that promised tax savings in excess of $150,000 over the investment's lifetime. The Violettes purchased three Eagle Wind Partnerships units for a total purchase price of $60,000, paying $6,500 in cash and executing a promissory note for the balance.

Shoup and ManEquity were not affiliated with the sellers or issuers of the Eagle Wind investment. Nor were they involved in preparation of the Eagle Wind Partnerships' offering materials.

Prior to executing the Eagle Wind Partnerships subscription agreement, the Violettes were given a copy of the private placement memorandum (PPM). The PPM listed in detail the numerous substantial risks associated with the investment.[3]

Rod Violette admitted that he carefully read the PPM and was aware of these risk factors. Violette also acknowledged that he had read the PPM information that the company insuring the investment, Northumberland General Insurance Company, if rated by A.M. Best Company, would rank near the bottom 10 percent in terms of capital and surplus of insurance companies doing business in the United States. The Violettes had also discussed the details of the Eagle Wind investment with the partnerships' accountant, Tom Eilers. Rod Violette testified that the PPM's insurance

---

[3]For example, the PPM stated: "THE INVESTMENT DESCRIBED IN THIS MEMORANDUM INVOLVES A *HIGH DEGREE OF RISK, AND PURCHASE OF UNITS SHOULD BE CONSIDERED ONLY BY PERSONS WHO CAN AFFORD THE TOTAL LOSS OF THEIR INVESTMENT*. . . . THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED WITH . . . THE SECURITIES AND EXCHANGE COMMISSION NOR BY THE SECURITIES REGULATORY AUTHORITY OF ANY STATE AND NO COMMISSION OR AUTHORITY HAS PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. . . ." (Italics added.)

The PPM further cautioned: "PURCHASE OF THE UNITS INVOLVES *MATERIAL RISKS AND ARE SUITABLE ONLY FOR PERSONS OF SUBSTANTIAL MEANS WHO HAVE NO NEED FOR LIQUIDITY* IN THIS INVESTMENT AND CAN AFFORD A *LOSS OF THEIR INVESTMENT*. SEE 'RISK FACTORS' . . . . [¶] A PURCHASER OF UNITS MUST BEAR THE ECONOMIC RISK OF THE INVESTMENT. . . ." (Italics added.)

The PPM also contained a "Risk Factors" portion, which was nearly 18 pages in length. That portion clearly stated that the investment was "SPECULATIVE AND INVOLVE[D] A HIGH DEGREE OF RISK."

The PPM also contained a section entitled "Suitability Standards," which warned: "BECAUSE OF THE *SIGNIFICANT RISKS* ASSOCIATED WITH THIS OFFERING, THE MINIMUM INVESTMENT REQUIRED AND RESTRICTIONS ON TRANSFER OF THE UNITS, PURCHASE OF THE UNITS SHOULD ONLY BE CONSIDERED *BY SOPHISTICATED INVESTORS WHO HAVE SUBSTANTIAL MEANS*, AND WHO ARE *PREPARED TO SUSTAIN A COMPLETE LOSS* OF THEIR INVESTMENT." (Italics added.)

provision and his conversation with Eilers were "instrumental" and a deciding factor in the Violettes' selection of the Eagle Wind investment. After reading the PPM and speaking with Eilers, the Violettes were provided with and read the subscription agreement, which they signed on December 18, 1984. In signing the subscription agreement, the Violettes acknowledged the risks associated with the investment.[4]

In January 1985, Shoup met with Rod Violette to discuss IRA's. Immediately before this meeting, Shoup learned from Sciaroni that the Violettes had invested in Eagle Wind Partnerships and the approximate amount invested. At that meeting Violette and Shoup did not discuss any specifics of the Eagle Wind investment. The Violettes purchased two IRA's through Shoup. Subsequently, in the summer of 1985, the Violettes applied for, but later declined, life insurance through Shoup. Shoup ultimately received $2,400 from Sciaroni through ManEquity, relating to the Violettes' investment in Eagle Wind. He testified that he did not know how the amount was calculated or determined and that he did not expect to receive any compensation for introducing the Violettes to Sciaroni or as a result of their ultimate purchase of the limited partnership units.

In the spring of 1985, the Violettes learned that the Eagle Wind investment was "failing" and that the general partner intended to resign. On July 2, 1985, the Violettes were told that Eagle Wind was "not functioning . . . as projected" and that it was "doubtful" insurance claims arising from the failure of the windmills would be paid. In August 1985, the Violettes were told that the IRS had determined Eagle Wind to be a "potential abusive tax shelter" and that the investment was under audit. Finally, on October 17, 1985, the Violettes learned that Eagle Wind's insurer was insolvent. Rod Violette testified that knowledge of this insolvency prompted him to file this lawsuit. The Violettes had not considered naming Shoup or ManEquity in the lawsuit until they discovered that Sciaroni had testified in her deposition that Shoup and ManEquity had received substantial compensation as a result of the Violettes' purchase of their interest in Eagle Wind.

---

[4]The subscription agreement provided in relevant part:
"*Acknowledgement of Risks*
"The undersigned has been furnished with and has carefully read the [PPM] and the documents. . . . The undersigned is aware of the following facts:
"1. The Partnership is a newly organized venture which has no properties or operating history . . . .
". . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
"3. There are substantial risks incident to the purchase of Units, as summarized under 'Risk Factors' and in other portions of the Memorandum. . . ."

*Procedural History*

Plaintiffs filed their complaint in July 1987, initially naming as defendants Eagle Wind Partnerships, Ltd., and its principals; Sciaroni and her proprietorship, Swiss American Investment Strategists. On January 20, 1989, the Violettes amended the complaint to name as Doe defendants Sciaroni's broker-dealer, Herbert Lawrence Consultants, Inc., ManEquity and Shoup. In January 1990, the Violettes further amended the complaint to name Johnson & Higgins, the insurance broker who obtained insurance on the investment. Only defendants Shoup and ManEquity remain in the case.[5]

In May 1991 after finishing their discovery, ManEquity and Shoup moved for summary judgment or, in the alternative, for summary adjudication, attacking all the claims asserted by the Violettes. In their opposition to the summary judgment, the Violettes conceded their claims for rescission, fraud, and alleged violations of state securities laws should be dismissed. Two claims remained: a negligence claim based upon Shoup's introduction of Sciaroni to the Violettes; and a claim that an agency relationship and agency liability existed between ManEquity and Shoup on the one hand and Sciaroni on the other, due to payment of a referral fee to Shoup. On June 7, 1991, the trial court granted a motion for summary judgment in favor of ManEquity and Shoup.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*

## I.

*Newly Discovered Evidence\**

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

## II.

The trial court granted summary judgment for defendants because the undisputed facts established that defendants Shoup and ManEquity owed no duty to plaintiffs. The trial court observed that the only evidence possibly giving rise to a factual inference of agency was the $2,600 payment to Shoup and it was undisputed that the payment was unexpected by Shoup and not bargained for. The evidence failed to demonstrate any relationship upon which the action could be based.

---

[5]The Violettes recently settled their claims against Johnson & Higgins, in whose favor summary judgment was granted in 1991. The Violettes also recently settled their claims against Sciaroni, Swiss American Investment Strategists and Herbert Lawrence Consultants, Inc.

*See footnote, *ante,* page 611.

■ " 'The purpose of a summary judgment motion is to determine if there are any triable issues of material fact, or whether the moving party is entitled to judgment as a matter of law. [Citations.] The summary judgment is proper only if the affidavits in support of the moving party would be sufficient to sustain a judgment in his favor and his opponent does not by affidavit show such facts as may be deemed by the judge hearing the motion sufficient to present a triable issue. [Citation.] ■ The affidavits of the moving party are strictly construed, while those of the party opposing the motion are liberally construed. [Citations.] If the affidavits of the party opposing the motion contain factual averments within the general area of the issues framed by the pleadings, they are sufficient to make out a prima facie case. [Citation.] ■ Any doubts as to the propriety of granting the motion must be resolved in favor of the party opposing the motion. [Citations.]' (*Cascade Gardens Homeowners Assn.* v. *McKellar & Associates* (1987) 194 Cal.App.3d 1252, 1255-1256 . . . .)" (*Petersen* v. *Securities Settlement Corp.* (1991) 226 Cal.App.3d 1445, 1451 [277 Cal.Rptr. 468].)

*No Agency*

■ " '[T]he determination that a duty of care exists is an essential precondition to liability founded on negligence.' (*Hooks* v. *Southern Cal. Permanente Medical Group, supra,* 107 Cal.App.3d at p. 443 [165 Cal.Rptr. 741].) 'The determination of duty is primarily a question of law.' (*Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 46 . . . .) 'A duty of care may arise through statute or by contract. Alternatively, a duty may be premised upon the general character of the activity in which the defendant engaged, the relationship between the parties or even the interdependent nature of human society. [Citation.] Whether a duty is owed is simply a shorthand way of phrasing what is " 'the essential question—whether the plaintiff's interests are entitled to legal protection against the defendant's conduct.' " (*Dillon* v. *Legg* (1968) 68 Cal.2d 728, 734 . . . , quoting from Prosser, Law of Torts (3d ed. 1964) pp. 332-333. . . .)' (*J'Aire Corp.* v. *Gregory* (1979) 24 Cal.3d 799, 803 . . . .)" (*McCollum* v. *Friendly Hills Travel Center* (1985) 172 Cal.App.3d 83, 90 [217 Cal.Rptr. 919].)

In order to determine the nature and scope of the duty owed by Shoup and ManEquity to the Violettes, we must first determine whether Shoup was acting as an agent for them or for Sciaroni. (*McCollum* v. *Friendly Hills Travel Center, supra,* 172 Cal.App.3d at pp. 90-91.) ■ The existence of an agency relationship is usually a question of fact, unless the evidence is susceptible of but a single inference. (*Id.,* at p. 91; *Magnecomp Corp.* v. *Athene Co.* (1989) 209 Cal.App.3d 526, 536 [257 Cal.Rptr. 278].)

"An agent 'is anyone who undertakes to transact some business, or manage some affair, for another, by authority of and on account of the latter, and to render an account of such transactions.' (3 Cal.Jur.3d, Agency, § 1, p. 10.) 'The chief characteristic of the agency is that of representation, the authority to act for and in the place of the principal for the purpose of bringing him or her into legal relations with third parties. [Citations.]' (*City of Los Angeles* v. *Sherwood* (1978) 85 Cal.App.3d 347, 351 . . . .) 'The significant test of an agency relationship is the principal's right to control the activities of the agent. [Citations.] It is not essential that the right of control be exercised or that there be actual supervision of the work of the agent; the existence of the right establishes the relationship.' (*Stevens* v. *Roman Catholic Bishop of Fresno* (1975) 49 Cal.App.3d 877, 887 . . . .)" (*McCollum* v. *Friendly Hills Travel Center, supra,* 172 Cal.App.3d 83, 91.)

In this case there is no suggestion that either the Violettes or Sciaroni had any right to control Shoup. Furthermore, the undisputed facts before the court established that Shoup and Rod Violette were social acquaintances, that Shoup informed Violette that he did not sell the type of aggressive tax shelters sought by the Violettes and was not experienced or knowledgeable about them. He referred Rod Violette to Sciaroni, a financial planner whom Shoup had met, but Shoup never vouched for Sciaroni's expertise or competence. Shoup never advised the Violettes about Eagle Wind. He was never asked by Sciaroni or the Violettes to comment on Eagle Wind. Indeed, Shoup did not know the Violettes were investing in that partnership until after the fact. Although Rod Violette stated he relied on Shoup to refer him and his wife to a competent financial planner, the undisputed facts belie such reliance. Rod Violette admitted he read the PPM carefully and was aware of its many attendant warnings of risk and that the presence of insurance and the conversation with Eilers were "instrumental" and "deciding" factors in the Violettes' selection of the Eagle Wind investment. The undisputed facts show that the Violettes did not rely on Shoup or any "implied warranty of competence" in deciding to invest in Eagle Wind.

A person does not become the agent of another simply by offering help or making a suggestion. As the court stated in *Edwards* v. *Freeman* (1949) 34 Cal.2d 589, 591-592 [212 P.2d 883]: "To permit a finding of agency upon this evidence would be, in effect, to hold that one who performs a mere favor for another, without being subject to any legal duty of service and without assenting to any right of control, can be an agent. This is not the law."

The Violettes contend that material evidence showed Shoup was the paid agent of either Sciaroni or the Violettes with attendant fiduciary

duties to the Violettes. They claim that the "uncertainty" of the relationship creates an issue of fact. We disagree. The undisputed facts demonstrate the absence of agency in this case and the payment to Shoup, which he did not expect or seek, does not raise a triable issue of fact as to the relationships of the parties.

Trying a different tack, the Violettes argue the commission payment establishes *some* agency-type relationship between Sciaroni and Shoup. The Violettes cite no authority for this proposition. We need not consider it. (*Downey Savings & Loan Assn.* v. *Ohio Casualty Ins. Co.* (1987) 189 Cal.App.3d 1072, 1090 [234 Cal.Rptr. 835]; Eisenberg et al., Civil Appeals & Writs (The Rutter Group 1992) ¶ 9.21, pp. 9.5-9.6.)

■ The Violettes also contend that the court could not rely upon Shoup's declaration that he did not expect any compensation for the referral. They argue that Shoup's state of mind is not a proper basis for the grant of summary judgment here. Although the summary judgment statute provides the court is not *bound* to accept an undisputed declaration by an individual as to his or her state of mind, such matter is committed to the discretion of the trial court. (Code Civ. Proc., § 437c, subd. (e);[7] *Petersen* v. *Securities Settlement Corp.*, *supra*, 226 Cal.App.3d 1445, 1458, fn. 8.)

The Violettes rely upon a footnote to our opinion *Easton* v. *Strassburger* (1984) 152 Cal.App.3d 90 [199 Cal.Rptr. 383, 46 A.L.R.4th 521], to support the proposition that the existence of a duty need not be based upon an agency in this case. In *Easton* we held that the listing real estate broker owed a duty to buyers to disclose material facts which the broker "should" have known through a "reasonably competent and diligent inspection of the property he has listed for sale." (*Id.*, at p. 99.) In our discussion of that issue, we noted: "Despite the absence of privity of contract, a real estate agent is clearly under a duty to exercise reasonable care to protect those persons whom the agent is attempting to induce into entering a real estate transaction for the purpose of earning a commission. [Citations.]" (*Id.*, at p. 98, fn. 2.)

*Easton* is inapposite. Initially, we do not agree that the footnote supports the Violettes' contention that a fiduciary duty may be found in this case in

---

[7] Code of Civil Procedure section 437c, subdivision (e) provides: "If a party is otherwise entitled to a summary judgment pursuant to this section, summary judgment shall not be denied on grounds of credibility or for want of cross-examination of witnesses furnishing affidavits or declarations in support of the summary judgment, except that summary judgment may be denied in the discretion of the court, where the only proof of a material fact offered in support of the summary judgment is an affidavit or declaration made by an individual who was the sole witness to that fact; or where a material fact is an individual's state of mind, or lack thereof, and that fact is sought to be established solely by the individual's affirmation thereof."

the absence of an agency. In *Easton*, the listing broker was clearly the agent of the seller, if not the buyer. Moreover, in the real estate area, complex issues of dual agency are common (see *Easton* v. *Strassburger, supra,* 152 Cal.App.3d at pp. 100-101, and fn. 4), and we are mindful that "[g]enerally speaking, standards relevant to the determination of duty in one particular situation may not be applied mechanically to other cases." (*Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 46, fn. 4 [123 Cal.Rptr. 468, 539 P.2d 36.) Further, there is no evidence Shoup was attempting to "induce" the Violettes to invest in Eagle Wind or any other tax shelter. Finally, in *Easton*, unlike the present case, certain "red flags" would have been discovered upon a reasonable investigation by the broker, whereas in the instant case there was no evidence Shoup should have known either that Sciaroni was incompetent or that the Eagle Wind investment was unduly risky.

In a case such as the instant one, the absence of an agency between Shoup and either Sciaroni or the Violettes is fatal to the latter's claim Shoup owed them a legal duty.

Moreover, were we to conclude that a factual dispute was presented as to the existence of an agency relationship between Shoup and the Violettes, we would still affirm the summary judgment on the grounds that based upon the undisputed facts, the scope of any duty by Shoup toward the Violettes did not encompass a duty to ascertain or inform the Violettes as to Sciaroni's competence or the risk of the proposed investment.

In *Petersen* v. *Securities Settlement Corp., supra,* 226 Cal.App.3d 1445, the Court of Appeal affirmed the judgment in favor of defendant Securities Settlement Corp. (SSC), a clearing agent for a series of stock transactions, following the grant of SSC's motion for summary judgment. (*Id.,* at p. 1448.) After reviewing the obligations of stockbrokers to customers for whom they handle nondiscretionary accounts, the court concluded that as a clearing broker SSC was not subject to the disclosure obligations set forth in the cases and had no obligation to warn the plaintiff about the risky nature of her investment. The court based its conclusion that SSC's duty was limited upon the unrefuted evidence that SSC made no investment recommendations to the plaintiffs. The court reasoned that disclosure obligations described in the cases "are predicated expressly on evidence a broker's recommendation was the controlling factor in the customer's stock purchase." (*Id.,* at p. 1454, citations omitted.) Moreover, as a clearing agent SSC had no direct access to the customer and the scope of the broker's duty to disclose is delimited by

the nature of the broker's relationship with the customer. (*Id.*, at p. 1456.)[8] As a clearing agent, SSC doubtless received a commission or fee on the transactions it processed. Still, there is no indication in the opinion that such fee was relevant to the determination of agency or to scope of any consequent duty.

Here, too, the undisputed evidence showed that Shoup made no investment recommendations and made no representations concerning Sciaroni's competence. There was no evidence presented that Shoup's actions or inactions were "controlling factors" in the Violettes' decision to hire Sciaroni or to invest in Eagle Wind. The evidence is to the contrary.

We conclude that the court properly granted summary judgment as the evidence demonstrated that Shoup was not acting as an agent and had no legal duty to advise the Violettes in connection with the investment or to ascertain or warrant Sciaroni's competence.[9]

The judgment is affirmed. Defendants shall recover their costs on appeal.

Smith, J., and Benson, J., concurred.

---

[8]Here, of course, Shoup did have a personal relationship with the Violettes. However, we believe the scope of any duty was similarly limited as he made no recommendations concerning investments and did no more than introduce Sciaroni to the Violettes.

[9]Nothing we have said here should be interpreted as accepting the existence of a cause of action for breach of implied warranty of competency. We do not consider that issue.