[No. G021350. Fourth Dist., Div. Three. Aug. 29, 2000.]

GAB BUSINESS SERVICES, INC., Plaintiff and Appellant, v.
LINDSEY & NEWSOM CLAIM SERVICES, INC., et al., Defendants and
Appellants.

COUNSEL

Ballard, Rosenberg & Golper, Kenneth R. Ballard, Reed E. Schaper, John J. Manier; Allderdice & Denman, Linda Auerbach Allderdice; Greines, Martin, Stein & Richland, Kent L. Richland and Barbara W. Ravitz for Plaintiff and Appellant.

Cummings & Kemp, Thomas B. Cummings and Christine Baran for Defendant and Appellant Lindsey & Newsom Claim Services, Inc.

Tomaryn & O'Reilly, Charles B. O'Reilly and Paul O'Reilly for Defendant and Appellant C. Randall Neal.

## OPINION

**SILLS, P. J.—**

### INTRODUCTION

GAB Business Services, Inc. (GAB) sued its former officer and employee, C. Randall (Randy) Neal, and Neal's new employer, Lindsey & Newsom

Claim Services, Inc. (Lindsey), for their respective roles in soliciting 17 key GAB employees to resign *en masse* in order to join Neal in new positions at Lindsey. GAB claimed Neal breached his fiduciary duty in orchestrating the exodus while still an officer at GAB. GAB accused its competitor Lindsey of unfair competition in assisting and benefiting from Neal's breach of fiduciary duty. GAB also sued both Neal and Lindsey on the novel claim of intentional interference with an employer's contract with its employees, along with misappropriation of trade secrets and other torts. A jury unanimously rejected all of GAB's claim. GAB complains, rightly, of instructional error. We reverse in part.

## FACTS

GAB is an independent adjusting company, operating since 1885. In 1991, when the relevant events took place, GAB employed over 3,000 people in about 120 branch offices nationwide. Randy Neal began his career at GAB in 1970 in an entry-level position. He steadily marched up the corporate ladder and by 1986, when GAB was acquired by a Swiss company, Neal was manager of the Los Angeles region. Two years later GAB restructured its operations, consolidating its 22 regions into eight. The board of directors elected Neal and seven others to the newly created corporate office of "regional vice-president."

The regional vice-presidents reported directly to the president of GAB. Each was the "top line manager" for his region, responsible for "overall regional planning, sales, quality control, budgeting and the performance of the region."

Neal was reelected by the board to the regional vice-president position in 1989, 1990 and 1991. The parties agree Neal was a highly valued employee. Briefs from both sides use the same language to describe him: "an active manager and a charismatic leader—hardworking, demanding, inspiring loyalty."

In September of 1990, GAB board member Bill Bergs became the corporation's president and chief operating officer. Within a month, Bergs and Neal had a falling-out and, unbeknownst to GAB, Neal began looking for a job elsewhere.

Lindsey had operated exclusively in Texas until 1988. By 1991, it had branched out into various regions of the United States, and though it had several small offices in California, it still had no western region. In April 1991, Lindsey offered Neal the new position of western regional manager.

That same month, the GAB board of directors reelected Neal to the office of regional vice-president.

Offer in hand, Neal quietly approached two close friends at GAB, Greg Martin, GAB's Sacramento branch manager, and John Orzes, an executive general adjustor for GAB. Neal invited the two to explore the Lindsey opportunity with him. In June 1991, Lindsey flew the three men to its corporate headquarters in Texas where they met with Lindsey's president, Terry Grant, who explained the company's plans to become the largest independent adjusting firm in America, with offices in every state.

In the ensuing weeks, Neal, Martin and Orzes conducted a financial analysis of GAB and Lindsey, and ultimately decided to pursue employment with Lindsey. Neal asked Grant for information on Lindsey's benefit plan, and for "a couple dozen" employment kits. Grant sent about 14 kits that contained an employment application, a description of benefits, benefit enrollment cards, a noncompetition agreement, and other information concerning Lindsey's policies.

In late August 1991, Neal, Martin and Orzes compiled a list of 14 other GAB employees they thought might want to join them in moving to Lindsey. The employees all worked under Neal's supervision at GAB. Between September 5 and 13, Neal approached the 14 employees (a 15th was contacted two days later) and presented each with the opportunity to come with him to work for Lindsey, which Neal represented as being in a "growth mode." Martin and Orzes participated with Neal in some of the solicitations.

Neal asked each employee what his salary was, and what amount would be necessary to get him to move to Lindsey. Neal settled on a desired new salary amount with each employee. The employees' proposed new salaries exceeded their GAB salaries by an average of 35 percent.

Neal assured his 15 "recruits" that their employment would be presented to Lindsey as an "all-or-nothing deal." If Lindsey refused to hire any one of the 18, or if any one of the 18 decided against going to Lindsey, then no one, including Neal, would go. All the employees Neal approached agreed to leave GAB for Lindsey. He instructed the group to keep its planned defection secret.

Up to that point, Lindsey knew nothing of Neal's plan to bring 17 GAB employees with him to Lindsey. On September 14 Neal called Lindsey's president, Grant, and accepted the offer of employment on the condition that he be allowed to bring about "a dozen-and-a-half" friends to the company

with him. Grant was "very surprised" and said he only wanted Neal. Neal told Grant "it was all or nothing," and Grant said he would have to think about it.

Two days later Grant told Neal, "We'll take you and the group." Grant did not want to know what salaries Neal proposed for the 17 employees he was bringing with him to Lindsey. Grant told Neal that responsibility for the region, including salaries, was up to Neal.

On September 17, Neal and the other 17 employees simultaneously announced their resignations. Their mass departure left some big holes at GAB: The group included seven branch managers and three regional adjustors, all of whom were considered to be the best in the region. Within the group were managers and "producers" (adjustors) from throughout California. As one of the departing employees stated in his deposition, "We were the team that made the western region run and hum."

Ten days after the mass resignation, GAB sued Neal and Lindsey for damages and injunctive relief. GAB asserted eight causes of action, including breach of fiduciary duty, misappropriation of trade secrets, tortious interference with contract and prospective economic advantage, conspiracy, and unfair competition. GAB obtained a temporary restraining order and preliminary injunction against Lindsey's use of GAB's customer lists, pricing information, or other proprietary and confidential information, as well as against any interference with GAB's existing customer contracts or employment relationships.

Trial lasted two and a half months. The cornerstone of GAB's case was that Neal, by virtue of his position as an officer of GAB, owed GAB a fiduciary duty of loyalty. GAB asserted Neal breached that duty by soliciting key fellow employees to leave GAB in a mass resignation to work for GAB's competitor, Lindsey. GAB asserted Lindsey engaged in unfair competition by assisting in and reaping the benefits of Neal's breach of fiduciary duty. The court refused to instruct the jury that Neal owed the fiduciary duty to GAB as a matter of law. The court also refused to instruct on GAB's theory of intentional interference with existing employment relationships.

By special verdict, the jury found Neal did not owe any fiduciary duty to GAB, that GAB did not own any trade secrets, that neither defendant intentionally prevented GAB's performance of any contract with a customer, or intentionally or negligently interfered with any economic relationship between GAB and a customer, or engaged or agreed to engage in any unlawful, unfair or fraudulent business practice toward GAB.

GAB filed unsuccessful motions for a new trial and for JNOV (judgment notwithstanding the verdict), and then timely appealed. Neal and Lindsey sought and were awarded costs and attorney fees. GAB filed an appeal and defendants filed a cross-appeal from the attorney fees award. We consolidated all the appeals.

## DISCUSSION

### I. *Instructional Error Concerning Neal's Fiduciary Duty to GAB*

GAB argues the trial court committed a colossal error in failing to instruct the jury that Neal owed GAB a fiduciary duty by virtue of his position as a corporate officer. Instead, the court treated the existence of a fiduciary duty as a question of fact for the jury. Of course, this decision proved to have disastrous consequences for GAB. Both GAB's breach of fiduciary duty and unfair competition claims were premised on the existence of a fiduciary duty on Neal's part. The jury found Neal owed GAB no such duty, dashing GAB's hope of prevailing on either claim.

#### A. *Finding a Corporate Officer's Fiduciary Duty as a Matter of Law*

There are *two kinds* of fiduciary duties—those imposed by law and those undertaken by agreement. (*Maglica v. Maglica* (1998) 66 Cal.App.4th 442, 447 [78 Cal.Rptr.2d 101]; see also *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 221 [197 Cal.Rptr. 783, 673 P.2d 660].) Fiduciary duties are imposed by law in certain technical, legal relationships such as those between partners or joint venturers (*Sime v. Malouf* (1949) 95 Cal.App.2d 82, 98 [212 P.2d 946, 213 P.2d 788]), husbands and wives (*Vai v. Bank of America* (1961) 56 Cal.2d 329, 337 [15 Cal.Rptr. 71, 364 P.2d 247]), guardians and wards, trustees and beneficiaries, principals and agents, and attorneys and clients (*Barbara A. v. John G.* (1983) 145 Cal.App.3d 369, 382-383 [193 Cal.Rptr. 422]). The court in *Barbara A.* termed this kind of fiduciary relationship, in which a fiduciary duty is imposed as a matter of law, a "legally recognized fiduciary relationship." (*Id.* at p. 383.)

GAB contends the relationship between a corporation and its officers belongs on the list of legally recognized fiduciary relationships. In support of its argument, GAB points to a host of California cases uniformly holding that a corporate officer owes a fiduciary duty to the corporation by virtue of his or her position. For example, in *Jones v. H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93 [81 Cal.Rptr. 592, 460 P.2d 464], the California Supreme Court held that the controlling shareholders' fiduciary duty "to use their ability to

control the corporation in a fair, just, and equitable manner . . ." applies "alike to officers, directors, and controlling shareholders in the exercise of powers that are theirs by virtue of their position." (*Id.* at pp. 108, 110.)

Likewise, in *Bancroft-Whitney Co. v. Glen* (1966) 64 Cal.2d 327 [49 Cal.Rptr. 825, 411 P.2d 921, 24 A.L.R.3d 795], the court summarized "[t]he general rules applicable to the duties of a corporate officer[:] . . . 'While technically not trustees, [corporate officers and directors] stand in a fiduciary relation to the corporation and its stockholders. A public policy, existing throughout the years, derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers.' " (*Id.* at p. 345, quoting from *Guth v. Loft, Inc.* (1939) 23 Del.Ch. 255 [5 A.2d 503, 510]; see also 2 Marsh & Finkle, Cal. Corporation Law (3d ed. 1997) Fiduciary Duties of Promoters and Directors, § 11.7, p. 828.)

In opposition to GAB's argument that an officer owes the corporation a fiduciary duty as a matter of law, Lindsey and Neal cite a number of cases holding that the existence of a fiduciary duty is a question of fact. These cases are inapposite, however, because each involves that *other kind* of fiduciary duty—one "undertaken by agreement" rather than "imposed by law." (*Maglica v. Maglica, supra*, 66 Cal.App.4th 442, 447.)

A fiduciary duty is undertaken by agreement when one person enters into a confidential relationship with another. As the court explained in *Barbara A. v. John G., supra*, 145 Cal.App.3d 369, a confidential relationship arises "where a confidence is reposed by one person in the integrity of another, and . . . the party in whom the confidence is reposed, . . . voluntarily accepts or assumes to accept the confidence[.]" (*Id.* at p. 382; *Sime v. Malouf, supra*, 95 Cal.App.2d 82, 98-99 ["One who voluntarily assumes a position of trust and confidence is a fiduciary, and he remains a fiduciary as long as trust and confidence are reposed in him. . . ."].) Not surprisingly, the existence of such a relationship founded upon agreement (the "repose" and "acceptance" of a confidence) is a question of fact. (*Barbara A. v. John G., supra*, 145 Cal.App.3d 369, 383.)

With the exception of *Barbara A.* (discussed *post*), all of the cases Lindsey and Neal rely upon for the proposition that the existence of a fiduciary duty

is a question of fact concern fiduciary duties arising from confidential relationships. (See, e.g., *Kudokas v. Balkus* (1972) 26 Cal.App.3d 744, 750-751 [103 Cal.Rptr. 318] [court found no evidence a confidential relationship existed between the seller of a motel and its "naïve" purchaser]; *Stokes v. Henson* (1990) 217 Cal.App.3d 187, 194 [265 Cal.Rptr. 836] [evidence proved a confidential relationship existed between group of unsophisticated investors and investment adviser]; *In re Daisy Systems Corp.* (9th Cir. 1996) 97 F.3d 1171, 1178 [question of fact whether a confidential relationship existed between investment banker and client].) None involves a legally recognized fiduciary relationship such as attorney-client, trustee-beneficiary, or officer-corporation.

*Barbara A. v. John G., supra,* 145 Cal.App.3d 369, does involve a legally recognized fiduciary relationship, with a twist: It concerns an attorney-client relationship that evolved into a sexual relationship. This blurring of relationship lines raised the question of the *boundaries* of the fiduciary duty owed from attorney to client. The case does not support defendants' argument that the existence of a fiduciary duty is always a question of fact.

Barbara A. sued her former attorney for battery and deceit, claiming he tricked her into a sexual relationship with false assurances of his infertility. As a result of John G.'s deception, Barbara A. suffered a life-threatening ectopic pregnancy which left her sterile. The deception occurred while John G. was acting as Barbara A.'s attorney.

Barbara A. contended the fiduciary duty John G. owed her as a *client* also extended to their personal, sexual relationship as a matter of law. (*Barbara A. v. John G., supra,* 145 Cal.App.3d at p. 382.) The stakes on this issue were high: If John G. owed Barbara A. a fiduciary duty within the context of their *personal* relationship, then John G. would bear the burden at trial of proving consent on the battery claim and disproving justifiable reliance on the misrepresentation claim. (*Id.* at p. 384.)

The court declined to rule as a matter of law that the range of an attorney's fiduciary duty to a client includes the personal relations between them. The court explained that the "unique facts" of the case "compel a more cautious approach in imposing on [John G.], as *a matter of law,* the highest fiduciary standard in all his relations with [Barbara A.], social as well as legal. The existence of a confidential relationship between [them] is more properly a question of fact for the jury, or court, who can better assess whether the legal relationship was dominant or whether the parties functioned on a more equal basis in their personal relations." (*Barbara A. v. John G., supra,* 145 Cal.App.3d at p. 384.)

In so ruling, the court affirmed that John G. owed Barbara A. a fiduciary duty as a matter of law within the legal, i.e., attorney-client, relationship. Whether he also owed her a fiduciary duty within the ambit of their personal, sexual relationship was a factual issue precisely because that relationship exceeded the bounds of an attorney-client relationship. *Barbara A. v. John G.* does not alter the rule that within an attorney-client relationship, as within all legally recognized fiduciary relationships, a fiduciary duty exists as a matter of law.

Not only are defendants' cases inapposite, but defendants' attempt to distinguish the authorities cited by GAB fails as well. Neal and Lindsey argue that all the cases imposing a fiduciary duty on officers as a matter of law concern officers who were presidents, and often also directors and majority shareholders, of their respective corporations. The message from these cases, according to defendants, is that "control is the determinative factor as to whether an individual is elevated to [the status] of a fiduciary." Because Neal did not hold a similarly powerful position at GAB (Neal contends he "had no control or authority whatsoever"), defendants argue he lacked the level of control within the corporation which gives rise to a fiduciary duty as a matter of law.

Defendants' focus on *control* as the determinative factor for finding a fiduciary duty in the corporate officer context is a strategic error. It betrays both a misreading of case law and a curious misperception of Neal's role at GAB.

As for the case law, we note, initially, that defendants can point to no case which makes the existence of an officer's fiduciary duty dependent upon a finding that the officer has controlling authority within the corporation.[1] Instead, the cases speak broadly of an officer's fiduciary duty, in terms applicable to all officers, rather than to only those with the ability to control the corporation. (See, e.g., *Burt v. Irvine Co.* (1965) 237 Cal.App.2d 828, 850 [47 Cal.Rptr. 392] [one of the defendant officers was a nondirector vice-president; the court stated that all corporate officers and directors owe the same fiduciary duty of good faith to the corporation and its stockholders]; see also *Bancroft-Whitney Co. v. Glen, supra,* 64 Cal.2d 327, 345; *Pigeon Point Ranch, Inc. v. Perot* (1963) 59 Cal.2d 227, 233 [28 Cal.Rptr. 865, 379 P.2d 321], disapproved on another ground in *Kowis v. Howard* (1992) 3 Cal.4th 888, 900-901 [12 Cal.Rptr.2d 728, 838 P.2d 250].)

In *Daniel Orifice Fitting Co. v. Whalen* (1962) 198 Cal.App.2d 791 [18 Cal.Rptr. 659], the officer accused of a breach of fiduciary duty was a

---

[1] In fact, Neal and Lindsey fail to identify any case in which a corporate officer was found *not* to owe a fiduciary duty to the corporation.

corporate vice-president and the chief engineer in charge of design and production for a valve manufacturing company. (*Id.* at p. 794.) The court stated, "As an officer of the plaintiff corporation for four years Whalen participated in management and necessarily owed a fiduciary duty to that company to put forth his best efforts and advance the position of that company in every way possible." (*Id.* at p. 797.) Clearly, *participation* in management is not top level control, but it was enough to impose a fiduciary duty on the officer in this case.

While control of a corporation may not be the appropriate test for fiduciary status, there is something to defendants' argument that a "nominal" officer cannot be a corporate fiduciary. After all, a corporation cannot make a mail clerk its fiduciary by simply bestowing upon the clerk the title of officer. We think something more than bare title, and less than control, is required.

An article entitled *Common Law Duties of Non-Director Corporate Officers* provides some insight into what makes an officer a fiduciary. (Sparks & Hamermesh, *Common Law Duties of Non-Director Corporate Officers* (1992) 48 Bus.Law. 215.) The article suggests the proper test for fiduciary status is whether the officer has discretionary management power: "Fiduciary duties attach to an officer if he or she is endowed by the board of directors or the bylaws with discretionary power to manage corporate affairs." (*Id.* at p. 236.) The authors note that "the duty of loyalty . . . does not vary with the non-director officer's *level* of discretion." (*Id.* at p. 218, italics added, discussing the official comment to § 8.42 of the Model Bus. Corp. Act (3d ed. 1985 & 1990 supp.) regarding standards of conduct for corporate officers.) In other words, so long as the officer has *some* discretion in managing corporate affairs, he or she is a fiduciary of the corporation.

This idea echoes the "participation in management" standard implicitly employed by the court in *Daniel Orifice Fitting Co. v. Whalen, supra,* 198 Cal.App.2d 791, 797. Management, of course, is the very essence of an officer's role. "Executive officers normally manage the day-to-day operations of the business of the corporation pursuant to provisions of the bylaws or delegation of the board." (1 Ballantine & Sterling, Cal. Corporation Laws (4th ed. 1999) § 88.03, p. 5-42 (rel. 52-9/93), § 102.02, p. 6-14.2, fn. 28 (rel. 70-8/98) ["corporate officers ordinarily have the direct managerial responsibility for the actual conduct of the affairs of a corporation"].) And, as any *student of business knows, management necessarily involves the exercise of discretion.*

█ We conclude an officer who participates in management of the corporation, exercising some discretionary authority, is a fiduciary of the

corporation as a matter of law. Conversely, a "nominal" officer with no management authority is not a fiduciary. Whether a particular officer participates in management is a question of fact. We expect that in most cases this test will be easily met. And, as in all legally recognized fiduciary relationships, once this factual prerequisite is established, the law imposes a fiduciary duty. (See, e.g., *Violette v. Shoup* (1993) 16 Cal.App.4th 611, 619 [20 Cal.Rptr.2d 358] [existence of agency relationship is question of fact, agent's fiduciary duty is a matter of law]; *Maglica v. Maglica, supra,* 66 Cal.App.4th 442, 448 [factual finding of formal marriage is prerequisite to imposition of statutory fiduciary duty between spouses regarding management and control of community assets]; *Johnson v. Superior Court* (1995) 38 Cal.App.4th 463, 477 [45 Cal.Rptr.2d 312] [finder of fact must resolve conflicting evidence bearing upon question of existence of attorney-client relationship, issue of duty is resolved as a matter of law].)

We note a potential danger in a focus on participation in management as the hallmark of an officer who bears a fiduciary duty to the corporation. The problem with this approach is it suggests that an officer who is suddenly stripped of management power or discretion similarly sheds his or her fiduciary duty. Such a result is untenable.

Even when an officer loses power or authority, that officer still owes a fiduciary duty to the corporation. To divest himself or herself of the duty, the officer must resign the office. (See *Sime v. Malouf, supra,* 95 Cal.App.2d 82, 97-98 [strained relations between joint venturers may be grounds for dissolution of the joint venture, but in the absence of a decree of dissolution, the fiduciary duty remains]; *Rader v. Thrasher* (1962) 57 Cal.2d 244, 249-250 [18 Cal.Rptr. 736, 368 P.2d 360] [client's loss of confidence in attorney does not lessen the attorney's fiduciary duties to the client "which arise from the assumption of the relationship by the attorney"]; *Vai v. Bank of America, supra,* 56 Cal.2d 329, 338 [even where the confidential relationship between spouses terminates, the fiduciary duty with respect to community property under each spouse's control remains].)

There is a practical reason for releasing an officer from fiduciary obligations only upon the officer's resignation or removal from office. Under statutory law, an officer can bind the corporation in dealings with third parties in which the officer has actual or *apparent* authority. (Corp. Code, § 208, subd. (b); Friedman, Cal. Practice Guide: Corporations (The Rutter Group 2000) ¶ 6:268, p. 6-53-17.) An officer, having once enjoyed actual

authority to deal with third parties on behalf of the corporation, is likely to retain apparent authority to do so, so long as he or she remains an officer. We believe such authority should be restrained by an accompanying fiduciary duty.

### B.  *Neal Was a Fiduciary of GAB*

■ Turning to the facts of the present case, we find the evidence clearly establishes that Neal participated in management as an officer at GAB. In March of 1990, six months before Neal's run-in with Bergs which precipitated his move to Lindsey, Neal himself characterized his authority as regional vice-president in sweeping terms. In an internal "position information questionnaire," Neal reported that he "make[s] decisions and commitments on complex and important issues for which there is no precedent"; he "[has] authority to develop and/or approve policies"; he "develop[es], allocate[s] and monitor[s] a [$20 million expense] budget"; and has "final responsibility" for matters involving the supervision and management of others, including performance appraisals, work assignments, discipline, hiring, compensation adjustments and terminations.

Neal's trial testimony further confirmed his management authority at GAB. Neal testified that as regional vice-president he was "at the top of [the] organizational structure" for the Los Angeles region. Neal explained that he received directives from the national office to achieve certain results within his region, and he had the discretion to determine how to achieve those results. He conceded that as regional vice-president he was "responsible for overall regional planning, sales, quality control, budgeting and performance of the region."

Defendants' attempts to characterize Neal as a nominal officer with no real authority are unconvincing. Defendants argue that he lacked the authority to take "unilateral" actions in areas such as hiring, firing, or signing documents as an officer. But the test for fiduciary status is not control; it is, instead, merely *participation* in management. This low threshold is easily met in this case.

Defendants also contend Neal's authority was "virtually dissolved" after Bergs became president. The contention is irrelevant. As we explained earlier, an officer's fiduciary duty does not dissolve when the officer's power is curtailed.

Because "the evidence is susceptible of but a single inference," we conclude as a matter of law that Neal was an officer who participated in

management of the corporation. (*Violette v. Shoup, supra,* 16 Cal.App.4th 611, 619.) Thus, he owed a fiduciary duty of loyalty to GAB as a matter of law. The court manifestly erred in failing to instruct the jury accordingly. Making matters worse, the jury, having been handed the question in error, wrongly answered it. We must now decide whether this error requires a reversal of the judgment.

### C. *The Prejudicial Effect of the Error*

Our Supreme Court has held that instructional error in a civil case requires reversal " 'where it seems probable' that the error 'prejudicially affected the verdict.' [Citations.]" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580 [34 Cal.Rptr.2d 607, 882 P.2d 298].) The conclusion that the error here "prejudicially affected the verdict" is inescapable. After finding Neal owed no fiduciary duty to GAB, the jury necessarily ended its inquiry into the alleged breach of that duty. The jury's erroneous conclusion on the fiduciary duty issue also led the jury to reject GAB's unfair competition claim: The jury had been instructed that GAB must prove Neal was a fiduciary of GAB to prevail on that claim.

Assessing the prejudicial effect of the court's instructional error here requires an additional step. We must consider whether the evidence was sufficient for the jury to find in GAB's favor on either the breach of fiduciary duty or unfair competition claims had the court properly instructed the jury concerning Neal's fiduciary duty. If there is a "reasonable probability" the jury would have reached a different result with proper instruction, we must conclude the verdict was prejudicially affected. (*Kaljian v. Menezes* (1995) 36 Cal.App.4th 573, 590 [42 Cal.Rptr.2d 510].)

Significantly, our standard of review in this regard is the opposite of the traditional substantial evidence test. " '[I]n assessing an instruction's prejudicial impact, we cannot use the view of the evidence and inferences most favorable to the [prevailing party]. [Citations.] Instead, we must assume the jury might have believed [appellant's] evidence and, if properly instructed, might have decided in [appellant's] favor. [Citations.]' [Citation.] Accordingly, we state the facts most favorably to the party appealing the instructional error alleged[.] [Citation.]" (*Krotin v. Porsche Cars North America, Inc.* (1995) 38 Cal.App.4th 294, 298 [45 Cal.Rptr.2d 10].)

#### 1. *The Breach of Fiduciary Duty Claim*

There was ample evidence to support a jury verdict in GAB's favor on the breach of fiduciary duty claim. Easing this analysis is the striking

similarity between Neal's conduct and that of an officer in *Bancroft-Whitney Co. v. Glen, supra,* 64 Cal.2d 327, who was found to have breached his fiduciary duty as a matter of law.

Glen was the president and editor-in-chief of Bancroft-Whitney, a publishing company. Glen signed a contract with Bancroft-Whitney's competitor, Matthew Bender & Co. (Bender Co.), to become the president of Bender Co.'s new western division. Keeping the contract secret, Glen remained in his employment with Bancroft-Whitney for another month, during which he assisted Bender Co. in effecting a raid on Bancroft-Whitney's key personnel. (*Bancroft-Whitney, supra,* 64 Cal.2d at pp. 334-341.) Glen provided Bender Co. with a list of talented Bancroft-Whitney employees whom he recommended be solicited to join Bender Co. He also supplied Bender Co. with the current salaries of each of these employees, and a suggested new salary for each. Finally, he personally solicited several Bancroft-Whitney employees to come with him to work at Bender Co. (*Ibid.*) Glen and his hand-picked group of 15 employees resigned from Bancroft-Whitney *en masse* to join Bender Co.

The court determined that Glen's conduct breached his fiduciary duty to Bancroft-Whitney as a matter of law. "It is beyond question that a corporate officer breaches his fiduciary duties when, with the purpose of facilitating the recruiting of the corporation's employees by a competitor, he supplies the competitor with a selective list of the corporation's employees who are, in his judgment, possessed of both ability and the personal characteristics desirable in an employee, together with the salary the corporation is paying the employee and a suggestion as to the salary the competitor should offer in order to be successful in recruitment. . . . We are of the view . . . that such an unpublished list . . . constitute[s] confidential information and that an officer of a corporation violates his trust if he reveals it to a competitor for the purpose of enabling the solicitation of the corporation's employees by the competitor." (*Bancroft-Whitney, supra,* 64 Cal.2d at pp. 350-351.) The court further held that "[t]he assistance given by Glen to the solicitation of the editors on the list is also . . . a breach of his fiduciary duty." (*Id.* at p. 352; see also 1 Ballantine & Sterling, Cal. Corporation Laws, *supra,* § 104.04, p. 6-29 (rel. 37-4/88).)

In the instant case, Neal engaged in very similar conduct, though it was perhaps a tad worse. While an officer of GAB, he likewise used his insider's knowledge of employee skills and salaries to recruit valued employees away from the corporation he owed a fiduciary duty to, and into jobs with the corporation's competitor. Neal's conduct was slightly worse than Glen's because Neal accomplished the solicitation himself, rather than merely "facilitating" it.

Lindsey argues that Neal did not really "solicit" the 17 employees to leave GAB; it contends all were in the process of being eliminated or leaving on their own. "Neal merely presented his colleagues . . . with an opportunity for employment elsewhere." While Lindsey's argument could conceivably carry the day with a jury, our task is to "assume the jury might have believed" GAB's evidence, not Lindsey's. (*Krotin v. Porsche Cars North America, Inc.*, *supra*, 38 Cal.App.4th 294, 298.)

Based on the evidence presented by GAB, we find it reasonably probable that a jury properly instructed concerning Neal's fiduciary duty would have found a breach of that duty. Consequently, the court's instructional error was prejudicial and requires reversal of the judgment. (*Kaljian v. Menezes*, *supra*, 36 Cal.App.4th 573, 590.)

### 2. *The Unfair Competition Claim*

■ We reach the same conclusion regarding GAB's claim of unfair competition. In *Bancroft-Whitney Co. v. Glen*, *supra*, 64 Cal.2d 327, the court held Matthew Bender & Co. liable as a matter of law for unfair competition because it cooperated with and reaped the benefits of Glen's breach of fiduciary duty. "It is clear from the evidence . . . that Bender was aware of or ratified Glen's breach of his fiduciary duties in all but a few respects, that he cooperated with Glen in the breach, and that he received the benefits of Glen's infidelity. . . . Under all the circumstances, Bender and Bender Co. must be held liable for their part in Glen's breach of his fiduciary duties. [Citations.] They encouraged the sowing and reaped the benefit. They cannot now disclaim the burden." (*Id.* at p. 353.)

GAB's evidence, which we must accept, establishes that Lindsey, likewise, cooperated in Neal's breach of fiduciary duty and benefited from it. Grant, Lindsey's president, either knew or should have known that Neal was contemplating bringing GAB employees with him to Lindsey. Neal asked for "a couple dozen" Lindsey employment kits; he brought Martin and Orzes with him to meet Grant. Moreover, when Neal presented himself to Lindsey as part of a "package deal," Grant accepted Neal "and the group" after two days' reflection. Lindsey obviously benefited from Neal's raid on GAB's employees: In hiring the 17 GAB employees, Lindsey obtained the skeletal structure of the western region it desired. Had the jury been properly instructed that Neal owed a fiduciary duty to GAB, we find it reasonably probable the jury would have gone on to find Lindsey and Neal liable for unfair competition.

### 3. *Damages*

■ Neal and Lindsey try to derail reversal by arguing that even if the jury had been properly instructed concerning the breach of fiduciary duty

and unfair competition claims, GAB could not have prevailed at trial because it failed to prove its damages. Defendants are wrong.

GAB presented evidence of myriad expenses it incurred as a result of the departure of the 17 employees. These expenses included the cost of recruiting and interviewing candidates for the positions the 17 employees vacated. It was "very difficult to find replacements" and GAB had to hire a recruiting firm. Temporary replacements had to be flown in from around the country, which cost the company in terms of travel and relocation expenses as well as the resulting disruption of business affairs. GAB also experienced reputational injury from the sudden departure of such a large group of key employees. Finally, GAB had an expert testify on various theories of lost profits resulting from the employee exodus.

Neal and Lindsey attack the testimony of GAB's expert, characterizing his methods as shoddy and his conclusions incredible. We need not address these criticisms. Even setting aside the testimony of GAB's expert, there was sufficient evidence of damage resulting from defendants' conduct to support verdicts in GAB's favor on the breach of fiduciary duty and unfair competition claims. Consequently, we find the instructional error concerning Neal's fiduciary duty prejudicially affected the verdict, necessitating reversal of the judgment as to these two claims.

Because we will reverse, we need not consider GAB's claims of additional errors stemming from this initial, fundamental instructional error. Specifically, we will not address GAB's arguments that the court erroneously allowed expert testimony on, and erroneously instructed the jury on, the criteria for finding a fiduciary relationship. When the case is tried again, neither error will reoccur. The jury will simply be instructed that Neal owed a fiduciary duty to GAB. ·

II.  *GAB's Claim of Tortious Interference with Its Employment Relationship*

██    GAB argues the trial court erred in refusing to instruct the jury on its theory that Neal and Lindsey intentionally interfered with GAB's employment relationship with the 17 employees. Finding no case law supporting an employer's right to state such a claim, the court declined to "mak[e] new law." The court acted wisely.

It is well established that the at-will nature of a contract does not preclude a tortious interference claim. In *Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118 [270 Cal.Rptr. 1, 791 P.2d 587], our Supreme Court stated, "We have affirmed that interference with an at-will contract is

actionable interference with the contractual relationship, on the theory that a contract ' "at the will of the parties . . . does not make it one at the will of others" ' [citations]." (*Id.* at p. 1127; *PMC, Inc. v. Saban Entertainment, Inc.* (1996) 45 Cal.App.4th 579, 599, fn. 15 [52 Cal.Rptr.2d 877] ["In California, an at-will contract is an *enforceable* contract and thus it may be actionable to interfere with that contract"].)

Cases have applied tortious interference claims in the specific context of at-will employment relationships. (See, e.g., *Kozlowsky v. Westminster Nat. Bank* (1970) 6 Cal.App.3d 593, 598 [86 Cal.Rptr. 52] ["the fact that the Bank was privileged to discharge plaintiff at any time does not necessarily privilege a third party unjustifiably to induce the termination"]; *Savage v. Pacific Gas & Electric Co.* (1993) 21 Cal.App.4th 434, 448 [26 Cal.Rptr.2d 305] [the tort of interference with contractual relations may be based on at-will employment contract]; *Truax v. Raich* (1915) 239 U.S. 33, 38 [36 S.Ct. 7, 9, 60 L.Ed. 131] [unjustified interference of third persons in the employment relationship "is actionable although the employment is at will"].) A leading commentator explains the principle underlying such claims as follows: "[I]nterference with employment . . . contracts terminable at will is actionable, since until it is terminated the contract is a subsisting relation, of value to the plaintiff, and presumably to continue in effect." (Prosser & Keeton, Torts (5th ed. 1984) § 129, pp. 995-996, fn. omitted.)

GAB's difficulty, however, is that no case has yet allowed an *employer* to bring such an interference claim. In all of the cases permitting a claim for tortious interference with an at-will employment relationship, the plaintiffs have been *employees* whose contracts had been terminated. GAB asks us to expand the tort to include employer claims. We see no compelling reason to expand the tort, and plenty of reasons not to.

First, of course, is the fact that recognizing an employer's right to sue for intentional interference with its employment relationships would invite innumerable lawsuits. As Neal points out, "an employer would be subject to exposure under almost any scenario upon the hiring of a competitor's at-will employee(s)."

The second reason has to do with California's strong public policy supporting the mobility of employees. (See *Metro Traffic Control, Inc. v. Shadow Traffic Network* (1994) 22 Cal.App.4th 853, 859 [27 Cal.Rptr.2d 573] [interpreting Bus. & Prof. Code, § 16600 as "an expression of public policy to ensure that every citizen shall retain the right to pursue any lawful

employment and enterprise of their choice"]; *Diodes, Inc. v. Franzen* (1968) 260 Cal.App.2d 244, 255 [67 Cal.Rptr. 19] ["The interests of the employee in his own mobility and betterment are deemed paramount to the competitive business interests of the employers . . ."].) Expanding the tort to include employer claims could have the unintended consequence of chilling employment opportunities: Faced with the likely prospect of litigation, employers may reasonably conclude that hiring a competitor's employee could be much more trouble than it's worth.

Finally, there seems to be something inherently suspect about a tort that, at bottom, concerns an employee's voluntary departure from employment. Of course, we do not want to condone unfair or unlawful conduct among employers competing for talented employees. However, we feel the tort of unfair competition, as applied in this case and in *Bancroft-Whitney Co. v. Glen, supra,* 64 Cal.2d 327, can adequately address that problem. We are unconvinced of the need for an additional avenue of recovery in tort. We thus decline to recognize an employer's right to sue for intentional interference with the employment relationship. We conclude the court properly refused to give the requested instruction.[2]

III.  *The Jury's Finding That GAB Owned No Trade Secrets*

■   GAB challenges the sufficiency of the evidence supporting the jury's finding that GAB owned no trade secrets. The challenge fails.

At trial, GAB contended Neal and Lindsey misappropriated various trade secrets, including the salaries of GAB employees. GAB concedes the court properly instructed the jury that a trade secret is information that "(1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (Civ. Code, § 3426.1, subd. (d).)

Despite the adequate instruction, GAB argues the jury improperly found GAB's salary information was not a trade secret. GAB contends evidence to the contrary was undisputed.

GAB is wrong. Evidence of the *secrecy* of GAB's salary information was indeed undisputed. But GAB failed to prove the other prong of the definition

---

[2]Likewise, we conclude the court properly refused to instruct the jury on GAB's companion theory of negligent interference with its employment relations.

of a trade secret: that the information had "independent economic value." GAB mistakenly assumed that secrecy equals economic value. It does not.

GAB wrongly relies on language from *Bancroft-Whitney Co. v. Glen*, *supra*, 64 Cal.2d 327, concerning the inherently confidential nature of salary information. (*Id.* at p. 351.) While the court in *Bancroft-Whitney* found the officer's disclosure of confidential salary information constituted a breach of fiduciary duty, the court found no trade secrets violation. (*Id.* at pp. 354-355.) The case does not support GAB's argument that confidential salary information has independent economic value.

The jury rejected GAB's claim that its salary information was a trade secret because the jury concluded the information lacked the necessary element of independent economic value. We cannot fault that factual finding.

IV. *The Attorney Fees Award*

Both sides have appealed the attorney fees awarded below. Neal and Lindsey contest the amounts awarded, and GAB complains of both procedural irregularities and the award's lack of "substantive merit." Because we are reversing part of the judgment upon which the award of fees is based, the order granting the attorney fees is set aside as well. Consequently, the appeals from the attorney fees order are moot.

DISPOSITION

The judgment is reversed as to the causes of action for breach of fiduciary duty and unfair competition. Only those claims will be retried. The remainder of the judgment is affirmed. The attorney fees order is vacated. No costs on appeal are awarded in this interlocutory proceeding, but may be assessed at the discretion of the superior court in favor of the party ultimately prevailing.

Crosby, J., and O'Leary, J., concurred.

A petition for a rehearing was denied September 26, 2000, and on September 14, 2000, and September 26, 2000, the opinion was modified to read as printed above. The petition of defendants and appellants for review by the Supreme Court was denied December 13, 2000.