Filed 12/16/13  Wang v. Wal-Mart Estate Business Trust CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| H. ROGER WANG et al., | D060888, D061060 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. SCVSS129158) |
| WAL-MART REAL ESTATE BUSINESS TRUST et al., | |
| Defendants and Respondents. | |

APPEALS from judgments of the Superior Court of San Bernardino, Donald R. Alvarez, Judge.  Affirmed.

Mohammed K. Ghods and William A. Stahr for Plaintiffs and Appellants.

Gresham Savage Nolan & Tilden, Theodore K. Stream and Jamie E. Wrage for Defendants and Respondents Wal-Mart Real Estate Business Trust, Wal-Mart Stores, Inc., Hall & Foreman, Inc. and Harold Garcelon.

Cooper, White & Cooper, Stephen D. Kaus and Edward L. Seidel for Defendant and Respondent LSA Associates, Inc.

This action for damages on fraud, breach of contract, and other theories arose out of a sale of undeveloped property by plaintiffs and appellants H. Roger Wang and Vivine Wang (the "Wangs"), to defendants and respondents Wal-Mart Real Estate Business Trust and Wal-Mart Stores, Inc. (sometimes together Wal-Mart, except where necessary to distinguish between the two).[1]  During the lengthy escrow period, Wal-Mart pursued a contractually authorized, concurrent store development application for the project site with the City of San Bernardino (the City; no longer a party).  During the development application process, Wal-Mart was assisted by retained civil engineers, defendant and respondent Hall & Foreman, Inc. and its vice president, defendant and respondent Harold Garcelon (collectively Hall et al.).  Hall et al. retained an independent contractor, defendant and respondent LSA Associates, Inc. (LSA), as a traffic subconsultant; at times, we shall refer to the three sets of defendants collectively.  Wal-Mart caused the Wangs, as current owners, to appoint Hall et al. as their agents to represent the Wangs' interests in the development application, by signing an "authorization" agreement.

After the sale closed, the Wangs sued defendants, alleging they conspired to conceal from the Wangs that Wal-Mart had pursued the development plans by obtaining the vacating of two portions of city streets (Gannett Parkway, bisecting the proposed project site, and McArthur Blvd., encumbering the site), but, contrary to the original understanding of the Wangs, did so without dedicating a new realigned street (to continue

---

[1]    The two Wal-Mart entities are legally separate.  Wal-Mart Real Estate Business Trust was the entity that purchased the property, and Wal-Mart Stores, Inc. develops and operates stores.  In this action, they are generally treated as interchangeable, except as noted.

2

McArthur Blvd.) that would have accessed additional nearby property owned by the Wangs (which otherwise was only accessible from the other direction). Based on the sales contract and the authorization agreement they signed, the Wangs alleged that various duties owed to them had been breached, and they were entitled to damages for diminished value of their other properties, which now lacks a secondary or alternative access road. The Wangs alleged that Wal-Mart and the other defendants had, through concealments and half truths told about the street design process (including the expected vacation of McArthur Blvd.), obtained extensions of the escrow period and purchased the property with street entitlements that unfairly disadvantaged the Wangs.

Following discovery and other motion proceedings, each set of defendants brought its own motion for summary judgment or adjudication of issues, contending the action had no merit and no triable factual issues precluded defense judgments. (Code Civ. Proc., § 437c; all further statutory references are to this code unless noted.) Additionally, Hall et al. and LSA sought to join in the motions brought by the other defendants. After opposition was filed and the matter argued, each of the defense summary judgment motions was granted, and separate orders and judgments were issued.

The Wangs appeal the summary judgments, contending the trial court failed to recognize that the existing contractual and fiduciary duties to disclose required the defendants to provide the Wangs with additional information, over and above that given through the development application and public street vacation process, about the evolving and eventually unfavorable street plans that were approved by the City. The Wangs take the position that all the parties understood, from the original development

3

application and traffic study, and Wal-Mart consistently represented, that a new street would be dedicated to replace the lost access to the Wangs' other properties, as previously provided by the vacated street, Gannett Parkway. Instead, the City approved and Wal-Mart created and installed at the end of McArthur Boulevard a turnaround easement and emergency access easement running along the back of the new store, neither of which provided the type of access that the Wangs desired. The Wangs claim $20 million in damages and diminution of value of their other properties that were directly attributable to various breaches of contractual and tort duties by each of the defendants.

In response, Wal-Mart argues that the contract of sale provided that it, as the purchaser, had "sole and absolute discretion" to seek and obtain entitlements to vacate a portion of the two streets that encroached on the project site, and it did so appropriately. All defendants argue that on the undisputed facts, as a matter of law, they came under no other types of duties to make further disclosures about the street planning process, and therefore no such alleged breaches caused any harm to the plaintiffs.

We have consolidated the appeals and now reject the Wangs' challenges to the trial court's granting of each of the motions for summary judgment. Since the motions demonstrated that the purchase agreement provided Wal-Mart, as assignee from the original purchaser, with sole and absolute discretion to seek and obtain governmental approvals and entitlements that were suitable to the project site, the Wangs had the obligation to raise triable issues about whether they had sufficiently placed the purchaser on notice of their desire to be informed of all street configuration plans or changes from the original traffic study contained in the development application. The Wangs failed to

4

do so, and did not show justifiable reliance on the initial application documents and traffic study, to establish such rights. Moreover, in light of the terms of the purchase contract and its development-related provisions, sufficiently available notice of the changes in the surrounding streets was otherwise provided through public land use planning procedures, as shown in the closing escrow instructions, and Wal-Mart was entitled to summary judgment.

Similarly, the Wangs did not demonstrate that their signing of the authorization agreement created a relationship that imposed fiduciary duties upon Wal-Mart, or Hall et al., or LSA, such that any existing duties were breached. The relationship between the parties created by the authorization agreement, and the hiring of the subconsultant LSA by Hall et al., did not create such duties as to require either of those contractors to individually, continually update the Wangs, as sellers, during the discretionary entitlement process about prospective changes to the traffic pattern that were not reflected in the original development application. Even assuming such fiduciary duties existed, the Wangs have not shown they notified any of the defendants that it was a material term of this development deal that they must retain dual access to their remaining properties, as shown in the original site plan. Their related tort theories fail, and we affirm each of the summary judgments.

FACTUAL AND PROCEDURAL HISTORY

As a summary of the transactional facts, we adapt and update portions of our previous opinion in this case, which was confined to anti-SLAPP issues. (*Wang v. Wal-Mart Real Estate Business Trust* (2007) 153 Cal.App.4th 790 (our prior opinion);

5

§ 425.16.)  Now, as then, "The parties are very far apart in their versions of how they believe the contract terms were formulated and whether any extra-contractual activity created any enforceable rights, with regard to the manner in which the transactions between the parties and the land use planning process were conducted."  (*Id. at* p. 795.)  In the discussion portion of this opinion, we shall add more specialized facts about the roles of the various participants, as needed.

### A.  Sales Transaction; Entitlements

In 1999, the Wangs owned a number of parcels of vacant property in San Bernardino, near the I-215 freeway.  They entered into a purchase and sale agreement (sometimes called the contract) to sell two parcels of their property (nos. 11 & 56) to a company which, in 2000, assigned the contract to a Wal-Mart entity, Wal-Mart Real Estate.[2]  Another Wal-Mart entity, Wal-Mart Stores, was essentially acting as the store developer, assisted by Wal-Mart's transactional counsel, Mark Ostoich.  The Wangs retained several of their nearby parcels for future development (nos. 6-9), located to the northeast of the Wal-Mart parcels.

The two parcels being purchased by Wal-Mart were cut in half by Gannett Parkway, which connected McArthur Boulevard (along their northerly border) to

---

[2]      The Wangs vaguely refer in their briefs to the reasonable expectations about continued street access that the original purchaser, a brokerage, may have had, before it assigned the contract to Wal-Mart Real Estate, about a year later.  However, they have not shown that the brokerage played any important role in the transaction, so as to give rise to legitimate parol evidence considerations for proving any undisclosed intent about a secondary access street.  As will be discussed, they cannot demonstrate that an interpretation of the plain language of the contract will not suffice to resolve all the contract-related issues presented.  (Pt. II, *post*.)

Hallmark Parkway (along their southerly border). At that time, Gannett Parkway leading northerly to McArthur provided one means of access (going toward the west) to the Wangs' other nearby parcels, and another street further to the east, Saratoga, provided them with a second means of access (going east). All parties anticipated that the two Wal-Mart parcels would be unified, and that this would require a northbound portion of Gannett Parkway to be vacated (to be replaced by the store's parking lot). Also, an existing portion of McArthur Boulevard that encumbered the parcels would be vacated.

The contract's paragraph 4.05, subdivision (b) provided that the purchaser had the "sole discretion" to approve certain conditions, including the obtaining of necessary discretionary and ministerial approvals and permits required for construction of a commercial retail center (designated "the entitlements"). Specifically, the purchaser was given the sole and absolute discretion to accomplish the vacation of a portion of McArthur Boulevard (par. 4.05, subd. (c)). The contract contains an integration clause (par. 7.06). The contract does not mention Gannett Parkway, nor does it include any express terms or requirements for preserving street access to the remaining parcels owned by the Wangs. The parties agreed in the contract to cooperate with each other to accomplish the transaction, including executing any necessary additional documents (par. 7.17).

While the escrow was pending, Wal-Mart Stores hired the civil engineering firm of Hall et al. to process its development plans by preparing a development application to the City. Hall et al. next retained LSA as traffic subconsultants, on an independent contractor basis. Starting in September 2000, their drawings showed that as part of the

7

project, portions of both Gannett Parkway and McArthur Boulevard would be vacated, and it was planned that McArthur Boulevard would be modified to "knuckle" and thus dedicated to connect to Hallmark Parkway. Private dedication of streets does not require the same public proceedings as vacation of streets.

For months, the parties continued to discuss future street design and traffic plans. For years, Caltrans had been proposing a freeway offramp bordering the project, where it might cut into the proposed store location. The City was studying other traffic options to accommodate the proposed freeway offramp.[3] Wal-Mart learned of this, and in October 2000, the parties agreed to the first amendment to the contract to extend the time for escrow to close. In its paragraph 3(c), Wal-Mart gave its deemed approval of any effect on its intended use of the property of the potential Caltrans freeway improvements near University Parkway. The other remaining contingencies included title and receiving the necessary entitlements, such as vacating the streets.

In November 2000, at the request of Wal-Mart's transactional attorney, Ostoich, the Wangs signed the authorization agreement to allow the development application to the City to be made in their names (as owners, pending escrow). This authorized Hall et al. to be appointed as the applicant to represent the owners' interests in connection with the development application. Wal-Mart's counsel sent the Wangs a copy of the development application that Wal-Mart was proposing, containing an initial

---

[3] The Wangs also sued both Caltrans and the City on inverse condemnation theories in this action. The City prevailed on demurrers to that claim and also one for declaratory relief. Caltrans filed a summary judgment motion, and according to the briefs, it was dismissed from the case.

8

environmental impact study (prepared by a nonparty) and a copy of the September 2000 LSA draft traffic study.  The traffic study included a site plan map showing a realigned McArthur Boulevard connecting to Hallmark Parkway.

The Wangs had their own development team working on the project, including their realtor Mark Boen, their agents Chung Tan and Jim Koenig, and their attorney, Mohammed Ghods.  In a December 19, 2000 cover letter returning the executed authorization to Wal-Mart's counsel, the Wangs' attorney Ghods stated:

> "Although the application referenced on the form is blank, I trust it is understood that my clients' authorization is based on the application that was delivered to me and is limited thereto."

As the development process continued, Hall et al. and LSA continued to revise the professional studies and plans for the properties.   Additional LSA traffic studies were dated February 6 and 14, 2001, and for a different area, April 2001.  Wal-Mart submitted the development application in mid-February 2001.  During February 2001, the attorneys for Wal-Mart and the Wangs continued to communicate about problems with the City departments in finalizing the entitlements for the project, to accommodate the potential location of the freeway offramp, and Attorney Ostoich told plaintiffs' attorney that he would keep them informed.  In a February 9, 2001 letter, the Wangs' attorney complained about the delay and offered to help negotiate with the City.

For Wal-Mart, Attorney Ostoich sent the Wangs a February 16, 2001 letter, stating that the application was again being delayed by additional uncertainty about the effect of the potential Caltrans freeway improvements near University Parkway and another traffic issue, and more time was needed, including a second extension of escrow to avoid losing

9

their existing contracting status, by irretrievably becoming "out of contract." The Wangs agreed to the extension in March 2001. None of the amendments changed the purchaser's "sole discretion" term regarding vacation of McArthur Boulevard (including a later third amendment).

On receipt of the development application, City officials prepared a staff report, showing that portions of both Gannett Parkway and McArthur Boulevard would be vacated, with attached maps dated February 12, 2001. Map exhibit 2 showed the area of proposed vacation of McArthur Boulevard and Hallmark Parkway, and did not show there was any additional connection between McArthur and Hallmark, because the report said the vacation was not taking effect until the planned realignment was to be dedicated. Map exhibit 3 showed the area of proposed dedication between McArthur and Hallmark.

The city council approved the staff report's recommendation on February 20, 2001. The City sent notice to the Wangs and other local property owners about the proposed vacation of portions of McArthur Boulevard and Gannett Parkway, with the map that showed the area of proposed vacation, but did not show there was any additional connection between McArthur and Hallmark planned. The Wangs received this notice along with all other area property owners. In February 2001, the City also sent the Wangs and other local property owners a form they could use to indicate whether they had any "conflict" with the proposal. The Wangs did not believe there would be any conflict, and their agent Chung Tan returned the City's form, which was received on February 26, 2001. He listed the numerous other parcels that the Wangs owned on the form.

10

Also in February 2001, Wal-Mart's attorney Ostoich communicated to the City planner, James Funk, about its continued concerns about some traffic aspects of the development application concerning the relocation of Gannett Parkway, and whether the current plan was feasible for the desired size and site of the store. Mr. Funk revised the staff report and sent it and a second request for city council action, dated March 12, 2001, in which he explained:

> "Initially, Wal-Mart had proposed to dedicate a realignment of McArthur Boulevard to connect with Hallmark Parkway. They have now indicated to us that the realignment would conflict with the proposed location of the building. The City Traffic Division and the City Fire Department have both indicated concern over terminating McArthur Boulevard if the vacation is approved. In response, Wal-Mart representatives have indicated to us that they would dedicate an easement for emergency vehicle access which they will also use as a truck alley for access to the truck dock."

The revised staff report contained a revised exhibit 3, showing the emergency vehicle access easement and a cul-de-sac behind the store, rather than the previous proposed right-of-way dedication or "knuckle" of McArthur Boulevard. At a public city council meeting, that normally would have been attended by the Wangs' "team," such as Mr. Boen, the City approved the revised report and adopted a resolution to vacate the portions of Gannett and McArthur that were within the petitioner's project site, to become effective when the easement for emergency vehicle access was granted by the petitioner, Wal-Mart. After a planning commission hearing in June 2001, the project was approved

11

and in July 2001, a negative declaration was issued under the California Environmental Quality Act (CEQA). (Pub. Resources Code, § 21000 et. seq.).[4]

After a third extension was granted in June 2001, escrow closed in April 2002, and the Wangs were sent escrow closing instructions and pro forma documents that included the City's resolution changing the street configuration, for the vacation of McArthur Boulevard, and including title insurance documentation of City easements for the turnaround cul-de-sac and the emergency vehicle access on McArthur. In Mr. Wang's declaration, he stated he never saw the purchaser's closing instructions. His attorney Ghods concluded after discussions with Attorney Ostoich that as sellers, the Wangs did not have to sign or spend time on the purchaser's closing instructions.

Under the contract, the final purchase price would be calculated per square foot according to a survey provided by the purchaser (in this case, Hall et al.) The Wangs were paid substantially more than the arranged contract price of approximately $2.6 million. Additional payment was owed for the square footage that had temporarily reverted to their ownership upon the vacating of the portions of Gannett Parkway and McArthur Boulevard.

In October 2003, the Wangs visited the site following the completion of construction, and they found a locked gate and no existing public access to the alley

---

4    According to Wal-Mart's attorney Ostoich, he saw that Mr. Boen was present at least at the June 2001 meeting. According to the Wangs, it is unclear whether Mr. Boen was present during the crucial parts of the meetings. In any case, the real issues are whether the Wangs were entitled to special notice, or had other opportunities to learn of and oppose the planned street realignment, at the relevant times. This was not the only evidence on that point.

behind the new Wal-Mart store. They learned that McArthur Boulevard ended in a cul-de-sac, it was not connected to Hallmark Parkway, and no other street had been dedicated to lead to their remaining parcels.

*B. Lawsuit; Current Motions; Rulings*

The action was filed August 15, 2005, against the Wal-Mart entities, Hall et al. and LSA, on theories of fraud, breaches of fiduciary duty and/or contract. The City and Caltrans were sued for inverse condemnation damages. Our prior opinion was issued in 2007.

On January 7, 2008, the Wangs filed a first amended complaint, adding to the above theories that these defendants had conspired to conceal that the Wal-Mart development plans did not replace the vacated street, Gannett, with other street access to benefit the remaining Wang parcels. The Wangs contended they received no notice from Wal-Mart or the City that instead of creating a new street as shown in the development application, Wal-Mart would be providing an easement for emergency vehicle access and a truck alley. The Wangs' remaining parcels now fronted onto a cul-de-sac and were less valuable.

After demurrers by Wal-Mart and the City were heard, the City was dismissed from the case. The operative claims against both Wal-Mart entities are: (1) fraud, deceit and conspiracy; (2) breach of fiduciary duty and conspiracy; (3) breach of contract; (4) specific performance; (5) promissory estoppel; (6) inducing breach of contract; and (7) intentional interference with economic advantage (Wal-Mart Stores only).

13

As against Hall et al. and LSA, the Wangs similarly alleged fraud and deceit and conspiracy, and further, breach of fiduciary duty and conspiracy. Additionally, Hall et al. were charged with promissory estoppel and inducing breach of contract.

Wal-Mart's motion for summary judgment, or alternatively summary adjudication, was filed in July 2009 and heard on May 6, 2010. In support of the motion, Wal-Mart requested judicial notice of the meeting minutes from the city council hearing approving the resolution that vacated portions of Gannett and McArthur. At argument on the motion in the trial court, Wal-Mart's attorney referred to the fluid nature of the development process and argued for adherence to the contract term granting it sole and absolute discretion to obtain appropriate entitlements. Wal-Mart also asserted statutory limitations bars to all claims, based on the knowledge about the traffic and access issues that the Wangs had or could have gained from the public proceedings or their own agents (their development team of real estate agents and their attorney). Extensive declarations and appendices of exhibits were filed and summarized in the separate statement (to be described as needed in the discussion portion of this opinion).

In the separate summary judgment motion brought by Hall et al., they contended that the evidence did not show they undertook any fiduciary relationship with the Wangs, based on the authorization agreement, nor made any fraudulent representations, nor ever directly interacted with them. Hall et al. also raised the bar of the applicable statutes of limitations.

LSA likewise argued in its motion the action was barred and/or unmeritorious, because it was an independent contractor performing a certain task as anticipated by the

14

development strategy. Each party filed separate statements outlining the supporting evidence presented on their arguments, and each sought to join in the motion brought by Wal-Mart. LSA also joined in the motion by Hall et al.

All motions were opposed by the Wangs, claiming summary judgment, were inappropriate due to various remaining triable issues of fact on all claims. In particular, they argued that the Wal-Mart waiver of the freeway loop contingency served to waive other contingencies, regarding the placement of the store on the available square footage. They contended their action was timely filed based on the discovery rule.[5] They raised numerous evidentiary objections to the declarations made by officials and attorneys for Wal-Mart, Hall et al. and LSA. Defendants responded with their own evidentiary objections.[6]

---

[5] The trial court did not accept the various statutes of limitations defenses raised by the defendants, and instead reached the merits of each of the motions. This was an appropriate legal determination and exercise of discretion. Contrary to the arguments of the Wangs, the defendants were not required to file a cross-appeal on this underlying limitations ruling. On de novo review, it is the correctness of the legal theories underlying the judgments that is our concern. (*California School of Culinary Arts v. Lujan* (2003) 112 Cal.App.4th 16, 22.) It is unnecessary for this court to address any limitations defenses.

[6] On appeal, the Wangs have not offered any arguments about the trial court's rulings on their evidentiary objections, except to generally claim that all defendants are "hiding behind attorney-client privilege," based on the participation of transactional attorney Ostoich, who acted for Wal-Mart and its team (Hall et al. and arguably, LSA, with respect to some of the public proceedings before the city council). Such a vague and insufficient argument does not require us to analyze the merits of the evidentiary rulings, and we treat any evidentiary issues as waived. (*People v. Stanley* (1995) 10 Cal.4th 764, 793.) This case must be resolved upon the given set of established facts and the issues of law that are presented.

15

After this lengthy briefing process, the trial court held sequential hearings on the motions. At the hearing on Wal-Mart's motion, the trial court first ruled upon the evidentiary objections and later issued a lengthy written ruling granting the motion in full (details to be summarized in the discussion portion of this opinion). The ruling first granted summary adjudication on each cause of action, then granted summary judgment. The same procedure was followed regarding the other moving parties, by addressing the evidentiary objections orally on the record and then preparing a written ruling granting the motion, which incorporated the reported rulings on the objections.

With respect to the joinder requests, the court concluded that each motion stood alone and was granted individually, although the Wal-Mart order reasoning was expressly incorporated into the order for Hall et al.[7]

After going through an exhaustive objection and response procedure for the preparation of the judgments, the court issued judgments incorporating the respective orders. The court concluded Wal-Mart, Hall et al. and LSA were each entitled to

---

[7] At the hearing, the trial court made it clear that the motions by Hall et al. and LSA were granted based on the showings they had each made, independent of the notice and evidence provided by their fellow defendants. We need not resolve the Wangs' ongoing claims that the defense notices of motion or joinders were insufficient or had to be cross-appealed by the respondents, and we must instead analyze the judgments on their merits. (*California School of Culinary Arts v. Lujan*, *supra*, 112 Cal.App.4th 16, 22.) Although the Wangs also argue that Wal-Mart's separate statement and argument were somewhat cursory as to the business tort claims, the trial court was fully presented with arguments about the defenses to all of the claims, and it appropriately resolved the issues, in light of the interrelationship among all the causes of action, the parties and the many overlapping agency issues. (*Juge v. County of Sacramento* (1993) 12 Cal.App.4th 59, 66-71.) We may simply disregard the off point reference the trial court made to the doctrine of law of the case, from its own previous rulings, as part of its joinder reasoning.

16

judgment as a matter of law. The Wangs appeal each judgment, and the LSA case was consolidated with the other appeal.

DISCUSSION

I

*INTRODUCTION*

The record confronts us with numerous theories of liability against numerous parties, which we will discuss in terms of contract and then tort principles. Overall, a fair reading of this purchase agreement and its extensions shows that it was expressly and consistently designed as a framework to implement a concurrent development application. It reflects the reasonable expectations of the commercially sophisticated parties that the buyer would invest the necessary time and expense, pending escrow, to obtain governmental entitlements necessary for such a development, with contingencies that had to be satisfied before the deal became sufficiently favorable to both parties to finalize. The contract evidently anticipated that the purchaser would be confronted with some evolution and change in the development plans, based on the fluid nature of the process, and that while the sellers continued to hold title pending escrow, they would retain some interests in common with the purchaser in obtaining the necessary permits, e.g., ensuring that the contingencies in the deal did not fail regarding entitlements.

With this overview, and with attention to the different roles that the various contractors-defendants played in the development application, we next address the contract claims, then the tort claims for fraud, fiduciary duty breach, and business interference. In this procedural context, we examine the record to determine if any triable

17

issues of material fact were properly identified and analyzed.  Summary judgment rulings are reviewed de novo.  (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767.) The evidence is viewed in the light most favorable to the opposing party, and resolving any evidentiary doubts or ambiguities in its favor.  (*Id*. at p. 768.)  Once the moving party has provided evidentiary submissions that show no material issues of fact require the process of a trial, the burden shifts to the opponent to show that a triable issue of one or more material facts exists.  (§ 437c, subd. (p)(1); *Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 853.)  Summary judgment is proper if no triable issue of fact is shown by all the papers submitted, such that the moving party is entitled to judgment as a matter of law.  (*Orrick Herrington & Sutcliffe v. Superior Court* (2003) 107 Cal.App.4th 1052, 1056-1057.)

On de novo review, the appellate court is not obligated " ' "to cull the record for the benefit of the appellant in order to attempt to uncover the requisite triable issues.  As with an appeal from any judgment, it is the appellant's responsibility to affirmatively demonstrate error," ' " through citations to the record and applicable authorities.  (*Bains v. Moores* (2009) 172 Cal.App.4th 445, 455.)  We next examine the challenges to the summary judgments.

18

## II

### *CONTRACT CLAIMS AGAINST BOTH WAL-MART DEFENDANTS;*
### *PROMISSORY ESTOPPEL*

### A.  Applicable Legal Principles

Under Civil Code section 1643 "[a] contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties."  As a basic goal of contract interpretation, the courts seek "to give effect to the parties' mutual intent at the time of contracting.  [Citations.]  When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible."  (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955 (*Founding Members*).)

As a basic rule of interpretation, the "intent and scope of the agreement" is determined "by focusing on the usual and ordinary meaning of the language used and the circumstances under which the agreement was made."  (*Lloyd's Underwriters v. Craig & Rush, Inc.* (1994) 26 Cal.App.4th 1194, 1197-1198.)  "California recognizes the objective theory of contracts [citation], under which '[i]t is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation' [citation].  The parties' undisclosed intent or understanding is irrelevant to contract interpretation."  (*Founding Members, supra*, 109 Cal.App.4th 944, 956; *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1166, fn. 3 (*Winet*).)

This contract contains an integration clause, paragraph 7.06. Section 1856 sets forth the permissible variations of terms of a written document by parol agreement. Generally, "[t]erms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement." (§ 1856, subd. (a).) To apply the terms of section 1856, subdivisions (a) through (c), the courts must determine as questions of law "whether the writing is intended by the parties as a final expression of their agreement with respect to such terms as are included therein and whether the writing is intended also as a complete and exclusive statement of the terms of the agreement." (§ 1856, subd. (d).)

However, under section 1856, subdivision (b), such seemingly finalized contract terms "may be explained or supplemented by evidence of consistent additional terms," but not if "the writing is intended also as a complete and exclusive statement of the terms of the agreement." (*Ibid.*) Section 1856, subdivision (c) further allows that apparently finalized contract terms "may be explained or supplemented by course of dealing or usage of trade or by course of performance."

## B. Contract and Wangs' Pleading

With respect to Wal-Mart Real Estate, paragraph 4.05 of the contract provides numerous conditions to the purchaser's obligation at the close of escrow. Under its subdivision (c), the purchaser was given the sole and absolute discretion to accomplish the vacation of such portion of McArthur Boulevard as the purchaser approves. Under its

20

subdivision (d), the seller was required to comply with all of the terms and conditions of the agreement before escrow would close.

The Wangs assert a right to contract damages, or in the alternative, specific performance of their claimed contract right to the building of a secondary or alternative access road. They claimed that they understood the mutual intention of the parties to the agreement (and their assignees) to be that "an appropriate two-way public access road would be provided" along the northern border of the property, to replace the previous Gannett Parkway access from McArthur to Hallmark. This could have been accomplished either by relocation of Gannett Parkway, realignment of McArthur, or dedication of a new street at such location.

With respect to the first amendment to the contract, the Wangs asserted that when Wal-Mart agreed to accept whatever potential impact the future freeway improvement might have upon its plans for the property, Wal-Mart also effectively waived other contingencies about the entitlements. Alternatively, there was some contractual implied duty for Wal-Mart to keep the sellers informed of any changes to the planned streets or secondary access. The Wangs asserted that when the traffic studies and plans were revised to eliminate that promised realignment, this placed an unfair burden upon them.

C. Contentions; Rulings; Contract Analysis

In opposition to the summary judgment motions, the Wangs' personal and attorney declarations addressed whether the original traffic studies and site plans created their reasonable expectations, as sellers, that the purchaser had agreed to take steps to preserve the secondary access to the Wang's remaining property, even though it was mutually

21

acknowledged that portions of McArthur Boulevard and Gannett Parkway were to be vacated. In Attorney Ghods's declaration, he refers to his December 2000 letter transmitting the signed copy of the authorization agreement, as accepting the development application only as it was then delivered to him. The Wangs assert this created or acknowledged a binding contract or understanding not to exceed or alter the terms, maps and plans in the initial development application.

The original purchaser assigned the contract to Wal-Mart Real Estate, which stands in its place and has the rights of the original contractor. (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 734, pp. 817-819.) Although the Wangs alleged that Wal-Mart Stores became an assignee or beneficiary of the contract, no such writing was produced. For purposes of our discussion, we accept as correct the trial court's determination that Wal-Mart Stores was not a party to the contract.

In ruling on the contract claims, the trial court determined there was no legal or evidentiary support for the Wangs's assertion that the contract with Wal-Mart Real Estate, as assigned to it and as amended, contained any implied provision requiring their desired road realignment. The court determined that although the agreement was silent as to the realignment, this silence did not create any ambiguity about the intention of the parties, which could otherwise be determined from the integrated terms of the agreement. (§ 1856.)

The Wangs raise several issues that they claim precluded summary judgment. First, they reiterate that the silence in the contract about what would be done with Gannett Parkway means that the contract is ambiguous, and parol evidence should have

22

been admitted to flesh out the terms of the contract, as they understood them. The contract only expressly referred to the plans to vacate McArthur, in the sole discretion of the purchaser. The Wangs do not allege there was an oral contract or oral modification of the contract, only that the reasonable interpretation of the written contract terms should favor their position. For example, their attorney stated at his deposition that "it was taken for granted" that the road would be relocated. Declarations by the Wangs say they meant to adhere to the terms of the original development application.

Such extrinsic evidence is admissible to prove only a meaning to which the contract is reasonably susceptible. (*Winet v. Price, supra*, 4 Cal.App.4th at p. 1165.) Here, the trial court evidently rejected the Wangs' arguments that their offered extrinsic evidence was material or suitable to prove their claimed interpretation of the contract (that they had a right to alternative access, once McArthur was vacated). This rejection amounted to an interpretive decision on a tendered issue of law, and it is properly subject to de novo review. The trial court correctly determined, as a threshold issue, not to admit and consider as material their evidence (e.g., declarations) about their undisclosed statements regarding intent or understanding about the secondary access to their other property that should be retained. (*Ibid.*; *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.) Under the objective theory of contracts, this evidence was irrelevant to aid in contract interpretation. (*Founding Members, supra*, 109 Cal.App.4th 944, 960.)

Next, to the extent that the Wangs rely upon the first amendment to the contract, in which Wal-Mart waived its right to adhere to the contingency about the future freeway improvement plans (as a condition to finalizing the agreement), their reliance is

23

unfounded. They did not assert that there was a separate oral contract in the amendments, and we need not consider any statute of frauds defenses to enforceability of the written contract, since all parties agree the contract was enforceable. (See 1 Witkin, Summary of Cal. Law, *supra,* Contracts, § 342, p. 390 [an unenforceable oral portion of a contract may be disregarded and the valid part enforced]; Civ. Code, § 1624.) In this written contract, other contract conditions were set forth in paragraph 4.05 before the purchaser's obligation at the close of escrow became enforceable, including assurance of the good state of title and the obtaining of suitable entitlements. Nothing in the amendments changed the condition about obtaining entitlements, left to the sole discretion of the purchaser.

Nor is it persuasive for the Wangs to rely on the cooperation clause in the contract, toward accomplishing the transaction, since they did not show the terms clearly required that entitlements must be obtained to their own satisfaction (par. 7.17). Further, although they claim their own actions should give meaning to the interpretation of the "ambiguous" contract, they cannot point to any specific actions they took toward preserving their desired dual access to their other properties. (See *International Billing Services, Inc. v. Emigh* (2000) 84 Cal.App.4th 1175, 1185.)

The Wangs also contend that the plain language of the contract should be interpreted using the principles of section 1856, subdivision (c), which allow that even seemingly finalized contract terms "may be explained or supplemented by course of dealing or usage of trade or by course of performance." Since this was a one time land sale contract, rather than an ongoing merchant relationship, this reliance is not well

24

supported by the legislative history of section 1856, which indicates that those terms of art, "course of dealing" or "course of performance," were to be interpreted in terms of the Commercial Code's definitions. (See Law Rev. Comm. com. to the 1978 amendment to § 1856, as follows: "It is expected that the courts will look to the definitions in Commercial Code Sections 1205 and 2208 for guidance in interpreting the meaning of the terms 'course of dealing,' 'usage of trade,' and 'course of performance.' "; 20A West's Ann. Code Civ. Proc. (2007 ed.) foll. § 1856, p. 11.)

With respect to their allegations of breach of contract and specific performance, the Wangs failed to produce any evidence of triable issues of material fact on how their undisclosed, unilateral expectations were sufficiently communicated to these defendants or otherwise became enforceable contract terms. (*Winet v. Price, supra*, 4 Cal.App.4th at p. 1166, fn. 3.)

D. Alternative Claim v. Both Wal-Mart and Hall et al.: Promissory Estoppel

*1. Plaintiff's Theory and Contentions*

"Promissory estoppel was developed to do rough justice when a party lacking contractual protection relied on another's promise to its detriment." (*Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 315.) Using equitable principles, this doctrine acknowledges that " 'A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.' " (*Id.* at p. 310; *US Ecology, Inc. v. State of California* (2001) 92 Cal.App.4th 113, 130.)

25

In claiming a right to promissory estoppel relief, the Wangs identify this theory as an alternative to their contract claims, and they assert that the maps, plans, and communications constituting both the purchase contract and the authorization agreement all amounted to promises for continued secondary access. They pled that the realignment of McArthur or other secondary access was known to be in their interests as owners (albeit owners of other properties), and Hall et al. was delegated to represent their interests through the authorization agreement.

### 2. Ruling and Analysis: Both Wal-Mart and Hall et al.

In making its ruling, the trial court acknowledged that no oral contract theories were being presented by the Wangs that would have raised any statute of frauds considerations. (Civ. Code, § 1624.) However, the court again determined that the written contract lacked any promise to provide any realigned street or alternative access, as the plaintiffs were seeking.

To the extent this claim is pled against Wal-Mart, it fails for the same reason that the contract claims failed. The trial court correctly interpreted the written contract, and it did not find any alternative promise deserving of enforcement arose during the course of dealing between the parties.

Likewise, with respect to Hall et al., they primarily dealt with their own client Wal-Mart, and pursued the interests that were then known to be common to both the parties to the purchase agreement, i.e., obtaining entitlements that would make the deal valuable enough to close escrow, once those conditions were satisfied. The Wangs have shown no personal communications to Hall et al. that created any duty to keep them

26

informed of any changes in the site plans.  The Wangs could not show that they reasonably relied on the initial development application, showing such a McArthur realignment, as representing the final embodiment of the entitlements that were to be obtained in the sole discretion of the purchaser.  Equity does not require that any such allegedly existing or separate promise be enforced, and summary adjudication was proper on this theory as well.

III

*CLAIMS BASED ON FRAUD*

The Wangs alternatively contend that even if their desired street realignment was not a defined contract term, the Wal-Mart "team" wrongfully concealed material facts about the changes in the entitlements being sought, despite their existing duties to disclose such activities.  We next examine the basis of any extracontractual potential liability for fraud, particularly as to Wal-Mart.

With respect to the other defendants, their liability is primarily based upon conspiracy and fiduciary duty theories, since it was never shown that Hall et al. or LSA personnel ever dealt directly with the Wangs, and only Wal-Mart's attorney Ostoich served as the contact person for the Wangs.  In part IV, *post*, we discuss the roles of Hall et al. and LSA more specifically.

A.  Fraud/Conspiracy:  Applicable Legal Principles

The basic elements of fraud are:  " '(1) representation; (2) falsity; (3) knowledge of falsity; (4) intent to deceive; and (5) reliance and resulting damage (causation).' "  (*Vega v. Jones, Day, Reavis & Pogue* (2004) 121 Cal.App.4th 282, 291 (*Vega*).)  The main

27

issues on fraud are whether the reliance claimed by the Wangs upon the presentation of the original development application, including its site plan and traffic study, was justifiable or reasonable, and whether the representations made by the defendants about the street realignment process were so incomplete and defective as to amount to fraudulent nondisclosure. (See *Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1108.)

These fraud-related issues, about how much general and specific knowledge was available to the Wangs about the process to justify their alleged reliance, must be distinguished from the statute of limitations issues raised, about whether their action was timely filed. For purposes of this opinion, we assume, as did the trial court, there was no limitations bar.

With respect to assessing the degree of justifiable reliance, the court in *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, explained that often, whether a plaintiff's reliance was reasonable is a question of fact. " 'However, whether a party's reliance was justified may be decided as a matter of law if reasonable minds can come to only one conclusion based on the facts.' " (*Id*. at p. 1239.) "Reliance exists when the misrepresentation or nondisclosure was an immediate cause of the plaintiff's conduct which altered his or her legal relations, and when without such misrepresentation or nondisclosure he or she would not, in all reasonable probability, have entered into the contract or other transaction." (*Ibid.*)

To support their fraudulent nondisclosure theories, the Wangs rely on *Vega, supra*, 121 Cal.App.4th 282, in which a pleading alleging fraud based on nondisclosure was deemed sufficient. In *Vega*, a law firm had provided an investment disclosure schedule

28

to the plaintiff, but it deliberately omitted known material facts. In such a case, "active concealment may exist where a party '[w]hile under no duty to speak, nevertheless does so, but does not speak honestly or makes misleading statements or suppresses facts which materially qualify those stated.' " (*Id.* at p. 294.) Even if some of the otherwise concealed or omitted information is publicly available, there can still be a claim for wrongful concealment, if only half-truths were misleadingly conveyed. (*Ibid.*) In any case, "the question in a nondisclosure case is whether the defendant knows of material facts, and also knows that those facts are neither known nor readily accessible to the plaintiff." (*Id.* at p. 295.)

"Active concealment or suppression of facts by a nonfiduciary 'is the equivalent of a false representation, i.e., actual fraud.' " (*Vega, supra*, 121 Cal.App.4th 282, 291.) Such a fraudulent nondisclosure claim requires a showing that "(1) the defendant failed to disclose a material fact which he knew or believed to be true, and (2) the defendant had a duty to disclose that fact. [Citation.] The duty to disclose arises when two elements are present: (1) the material fact is known to (or accessible only to) the defendant; and (2) the defendant knows the plaintiff is unaware of the fact and cannot reasonably discover the undisclosed fact." (*San Diego Hospice v. County of San Diego* (1995) 31 Cal.App.4th 1048, 1055 (*San Diego Hospice*); italics omitted.) "A duty to disclose may also arise in the so-called 'half truth' context--that is, when a speaker makes a representation which, though not false, he knows will be misleading absent full disclosure of additional facts known to him which qualify the initial representation." (*Ibid.*, fn. 4.)

29

Such a duty to disclose requires some scienter, or knowledge by the defendant "of significant facts the plaintiff needs but does not have." (*Ibid.*)

In *San Diego Hospice*, the court noted it is most doubtful whether any "imputed knowledge" can give rise to a duty to disclose. (*San Diego Hospice, supra,* 31 Cal.App.4th 1048, 1056, citing *Lingsch v. Savage* (1963) 213 Cal.App.2d 729, 738-739 [actionable duty to disclose requires scienter: defendant must know the facts and also know that plaintiff is ignorant of those facts].)

The Wangs' related claim for civil conspiracy to commit fraud requires proof of three elements: "(1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct. As is well established, civil conspiracy is not an independent tort. [Citation.] Rather, civil conspiracy is a 'legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. [Citation.]' " (*Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571, 1581 (*Kidron*).)

### B. Wal-Mart Pleading and Ruling; Analysis

The Wangs' fraud theory asserts that the defendants individually, and through conspiracy, fraudulently concealed material facts about the changes in the traffic planning as the development application progressed, and made only partial disclosures while concealing the harmful impact that the development would ultimately have upon the Wangs' other parcels on McArthur Boulevard. The Wangs assert they were lulled into a false sense of security by the representations made by defendants that they would protect

30

the interests of the Wangs, and accordingly extensions of the escrow periods were granted that would not otherwise have been granted.

In its ruling, the trial court determined that Wal-Mart had presented uncontroverted evidence that the Wangs had never advised the other parties in the purchase transaction that keeping dual access between McArthur Boulevard and Hallmark Parkway was material to them. The Wangs had not provided any evidence that they or their agents told Wal-Mart or its agents that their other parcels on McArthur Boulevard, were being held for future development, and that the realignment of McArthur was important to protect the value of their other properties. Nor did they provide other evidence showing why a change in the proposed realignment plan would be significant to them.

The trial court further concluded that neither the term in the contract that gave Wal-Mart sole discretion to obtain entitlements, nor the first amendment to the contract that waived any objections to the effect of the Caltrans freeway improvements upon the building site, nor the exchange of information between the attorneys for the buyer and seller, served as a matter of law to place any existing contractual or extracontractual duty upon Wal-Mart to make further disclosures about the progress of the entitlement applications, or the elimination of the proposed realignment. Accordingly, Wal-Mart was entitled to summary adjudication and judgment on the fraud claim.

The fiduciary duty ruling in favor of Wal-Mart was similar, and further noted that since the evidence showed the Wangs had their own skilled development team, it was unlikely that they were chiefly relying upon the authorization agreement as creating

31

fiduciary duties to protect the proposed street access to their other parcels, on the parts of the defendants.

To challenge these rulings, the Wangs contend the trial court failed to recognize that triable issues of fact remained about the extent of knowledge on the part of defendants about the existence of the other properties owned by the Wangs, and their need for continued secondary access. They claim that all evidentiary inferences should be drawn in their favor, as parties opposing the motion. (*Saelzler v. Advanced Group 400, supra*, 25 Cal.4th 763, 768.) However, the plain terms of the contract focused on the properties that the Wangs were selling to the purchaser, not upon their remaining properties, and the Wangs have not been able to show that they inserted a contract term for such continued alternative access.

To support their claim of fraudulent nondisclosure, the Wangs nevertheless argued they always assumed that based upon what they knew, the street design would stay the way it was shown in the original development application. The course of dealing between the parties included several amendments to extend escrow, expressly done for the purpose of pursuing the entitlements as the buyer wished, through the development application. The purpose of the authorization agreement was evidently to ensure that the development application would be filed to enable the project to go forward, and it was filed. Even though the authorization agreement was obtained by Wal-Mart, to allow Hall et al. to represent the interests of the current owners (the Wangs), no evidence has been shown in support of the Wangs' claim that Wal-Mart made false representations by knowingly but secretly diverging from their common interests. As those common

32

interests existed when the authorization agreement was signed, they were to make a feasible, discretionary development project. The Wangs did not show that Wal-Mart was placed on notice of what they considered to be the most relevant facts or terms, but nevertheless intentionally proceeded to defraud the Wangs in that particular respect. (*Lingsch v. Savage*, *supra*, 213 Cal.App.2d 729, 738-739.)

With respect to the claimed reliance by the Wangs on the terms of the original development application, Wal-Mart produced evidence showing that other, contrary evidence was made available to the Wangs of the proposed changes to the road configuration. In February 2001, their agent Chung Tan returned a City form showing they did not have a conflict with the vacation of portions of McArthur and Gannett, even in light of the numerous other parcels they owned that were listed on the form. Although it is true that the vacation of a street requires public proceedings, while the dedication of a street does not, the Gannett/McArthur vacation issues were only part of the overall traffic pattern design. All of these access issues were so closely related that the Wangs were at least placed upon inquiry notice about the progress of the entitlement design process. After all, they were sophisticated sellers of investment property. (See *Alliance Mortgage Co. v. Rothwell, supra*, 10 Cal.4th 1226, 1239-1240 [" 'the issue is whether the person who claims reliance was justified in believing the representation in the light of his own knowledge and experience' "].)

In March 2001, the process of continuing the escrow period for the second time involved more attorney to attorney communications about the ongoing city entitlement problems. Earlier, the first amendment extending the escrow period had served to waive

33

any Wal-Mart objections to the proposed freeway off-ramp improvements, but it was not shown to have expressly or impliedly waived the other contingencies regarding the location of the project (title and entitlements). The cooperation clause in the contract did not place additional duties upon Wal-Mart, to find out any desired terms the Wangs did not place in the contract.

The evidence showed that the May and June public city council and planning commission hearings were attended by members of the Wangs' development team, and Wal-Mart attorney Ostoich testified that he saw Mr. Boen at least at the June meeting. When the closing escrow instructions were delivered to the Wangs, they included title insurance documentation of the McArthur turnaround and the emergency access easements at the site, which were different from the original application. All of these factors in the record belie any claim by the Wangs that the material facts about the entitlement process were "neither known nor readily accessible to the plaintiff." (*Vega, supra*, 121 Cal.App.4th 282, 295.) Rather, the Wangs knew the entitlement process was discretionary and ongoing until escrow closed.

This case resembles those authorities cited in *Vega, supra*, 121 Cal.App.4th 282, which rejected fraudulent concealment claims "where the information in question was readily accessible, or plaintiff was on inquiry notice of the allegedly concealed information." (*Id.* at p. 295; see *Stevenson v. Baum* (1998) 65 Cal.App.4th 159, 165-167.) Here, the Wangs cannot show that they were entitled to justifiably rely on the terms of the original development application, even in light of the terms of the authorization agreement. The very purpose of that agreement was to pursue such further

34

proceedings with the City. The Wangs did not show they were entitled to go to trial on their fraud theory that the defendants committed or participated in wrongful conduct in furtherance of a conspiracy.

IV

*FRAUD, BREACH OF FIDUCIARY DUTY AND CONSPIRACY*

Although Wal-Mart's attorney worked with the Wangs on the project, and disclosed the work product of Hall et al. and LSA to them, Wal-Mart remained an arm's-length purchaser in this commercial transaction. Thus, Wal-Mart was charged with breach of fiduciary duty only on a conspiracy basis.

As to Hall et al. and LSA, the trial court proceedings treated these fraud and breach of fiduciary duty allegations as inextricably interrelated. The terms of the authorization agreement allowed Hall et al. (and allegedly, its independent contractor LSA) to represent the interests of the Wangs in pursuing the development application. We next examine the basis of any fiduciary duty on the part of Hall et al. and LSA, either as an alleged affirmative duty, or as created through the agency or conspiracy allegations. We thus determine if any triable material factual issues remain.

A. Applicable Legal Principles; Ruling Regarding Hall et al.

To establish a cause of action for breach of fiduciary duty, a plaintiff must demonstrate the existence of a fiduciary relationship, breach of that duty and damages. (*Pierce v. Lyman* (1991) 1 Cal.App.4th 1093, 1101; *Charnay v. Cobert* (2006) 145 Cal.App.4th 170, 182.) " 'The essence of a fiduciary or confidential relationship is that the parties do not deal on equal terms, because the person in whom trust and confidence

35

is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party.' " (*Richelle L. v. Roman Catholic Archbishop* (2003) 106 Cal.App.4th 257, 271.) Such potential " 'liability is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation.' " (*Id.* at p. 273.)

The doctrine of civil conspiracy " 'imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. [Citation.]' " (*Kidron, supra*, 40 Cal.App.4th 1571, 1581.) However, "[a] nonfiduciary cannot conspire to breach a duty owed only by a fiduciary. 'Conspiracy is not an independent tort; it cannot create a duty. . . . It allows tort recovery only against a party who already owes the duty . . . based on applicable substantive tort law principles.' " (*Id*. at p. 1597 quoting *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 514.)

In its oral ruling, incorporated into the written order, the trial court found that Hall et al. had met their burden of showing they had no relationship with the Wangs that caused them to gain knowledge that realignment was a material issue for the Wangs in the transaction, or thus to come under a duty to disclose any changes in the street plan occurring during the application process. The authorization agreement did not create such a duty, because Hall et al. were not shown to have been placed on notice by the Wangs that their interests included strict adherence to the original site plan. The court also relied on the related ruling that Wal-Mart had absolute and sole discretion over the

36

entitlement process in the purchase agreement, so Hall et al. lacked any separate duty to make updates on the process.

## B. Tort Claims and Analysis:  Hall et al.

As against Hall et al., the Wangs based their claims of breach of fiduciary duty obligations upon the agency created by the authorization agreement, to represent the interests of the Wangs as owners.  An agent has the power to alter the legal relations between the principal and third persons, or the principal and the agent.  (*Lewis v. Superior Court* (1994) 30 Cal.App.4th 1850, 1869 (*Lewis*).)  An agent should act as a fiduciary regarding matters within the scope of the agency.  (3 Witkin, Summary of Cal. Law, *supra,* Agency & Employment, § 97, pp. 143-144; Civ. Code, §§ 2295, 2322, subd. (c).)  "Thus, an agent is required to disclose to the principal all information relevant to the subject matter of the agency."  (3 Witkin, Summary of Cal. Law, *supra*, § 97, p. 144.)  A principal has the right to control the conduct of the agent on the subject of the agency. (*Lewis, supra*, at p. 1869.)

Generally, the existence of an agency is treated as a factual question, unless the evidence is undisputed; then, "the issue becomes one of law."  (3 Witkin, *supra*, Summary of Cal. Law, Agency & Employment, § 93, p. 141, citing *Magnecomp Corp. v. Athene Co*. (1989) 209 Cal.App.3d 526, 536; *Violette v. Shoup* (1993) 16 Cal.App.4th 611, 619.)

By analogy, "A bare employee-employer relationship does not create a confidential relationship."  (*Amid v. Hawthorne Community Medical Group, Inc.* (1989) 212 Cal.App.3d 1383, 1391 (*Amid*).)  A " 'mere placing of a trust in another person does

37

not create a fiduciary relationship.' " (*Ibid.* quoting *Zumbrun v. University of Southern California* (1972) 25 Cal.App.3d 1, 13.) The nature of the relationship must be such as to cause the plaintiff to rely on the fiduciary. (*Alliance Mortgage Co. v. Rothwell*, *supra*, 10 Cal.4th 1226, 1239-1240; *Lee v. Escrow Consultants, Inc.* (1989) 210 Cal.App.3d 915, 921.)

Hall et al. has consistently contended that the evidence did not show they intended to undertake any fiduciary relationship with the Wangs, nor did they ever directly interact with them nor learn from them that the proposed realignment of McArthur was important to protect the value of their other properties. Hall et al. did not sign the authorization agreement, but were hired by Wal-Mart Stores to prepare the development application on behalf of Wal-Mart Real Estate. In turn, they hired LSA as an independent contractor to prepare a traffic study. Both were essentially supervised by Wal-Mart's transactional attorney, Ostoich, and he testified that during City development proceedings at times, he was representing the whole team as agents for Wal-Mart.[8]

The nature of the agency asserted by the Wangs, as ostensible principals for the Wal-Mart development team, is somewhat unclear. The record does not show that the Wangs had or asserted any right to control their conduct on the subject of the alleged agency. (*Lewis, supra*, 30 Cal.App.4th at p. 1869.) Even though agents have a duty to inform their principals "of matters in connection with the agency that the principal would

---

[8] In his deposition, Attorney Ostoich said at one point he had represented all the Wal-Mart development team members in dealing with the City. Attorney-client privilege issues thus arose in this action, but are not germane to the issues actually argued on appeal.

38

desire to know about," the scope of this agency, regarding purchased lots 11 and 56, was still not shown to be so broad as to protect the interests of the Wangs in preserving dual access to their other properties. (See 3 Witkin, Summary of Cal. Law, *supra*, Agency & Employment, § 150, p. 195; Civ. Code, § 2332 ["As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other."].)

On this record, the subject matter of any defendants' alleged agency for the Wangs, to act for them as principals, appears to have been limited to processing the development application, as expressly contemplated by the purchase contract. Whether such agency, as a matter of law, imposed a fiduciary duty depends on the nature of the relationship established. (*Richelle L. v. Roman Catholic Archbishop, supra,* 106 Cal.App.4th 257, 273 [liability for breach of fiduciary duty results from an abuse of a close, confidential relation, not from separate contractual arrangements].) Under the contract, Wal-Mart did not become obligated to close escrow unless the contingencies were satisfied, including obtaining the entitlements. It was in the interests of both Wal-Mart as the buyer and the Wangs as the sellers to satisfy those contingencies, and Hall et al. assisted in the process.

The Wangs did not present evidence creating triable issues of material fact that they placed Hall et al., as their actual or ostensible agents, on notice that their interests in their other properties required the preservation of the original site plan and street realignment, on the property to be sold. Rather, the actions of Hall et al. and Attorney Ostoich in pursuing the development application were taken within the scope of the

39

purchase contract, but the contractual duty of cooperation provides no source for a fiduciary duty. Nothing that the defendants did created additional duties to protect the Wangs' interests in any particular way, regarding the state of access to their other properties. Even if the Wangs placed their trust in Hall et al. to pursue their interests, their unilateral beliefs did not create a fiduciary-type relationship. (*Amid, supra*, 212 Cal.App.3d 1383, 1391.)

Even assuming Wal-Mart's attorney, as agent for Wal-Mart, knowingly concealed adverse material facts about realignment from the Wangs, it is unclear how his knowledge would be imputed to team members Hall et al. (or LSA), under principles of agency. "The test of imputed notice is whether the facts concern the subject matter of the agency and are within its scope. Generally speaking, notice is imputed to the principal of any facts relating to the subject matter of the agency of which the agent acquires knowledge or notice while acting as such within the scope of the agent's authority. It is not enough that the facts concern the business of the principal; they must be so related to the subject of the agency as to bring them within the duties of the agent." (3 Witkin, Summary of Cal. Law, *supra,* Agency & Employment, § 151 , pp. 196-197.) The Wangs did not expect Ostoich to report to them, and he dealt directly with their own attorney in pursuing the entitlement process, to keep him notified of the deadlines and applications, within the scope of the authorization agreement.

Even assuming that Hall et al. undertook some kind of fiduciary duty based on the pure language of the authorization agreement, the Wangs could not establish that either the Hall (or LSA) defendants had dealt directly, or through agents, with the Wangs in

40

such a manner as to breach any such fiduciary duty to protect any disclosed or "reasonable" expectations of the Wangs, as sellers of these properties, that their interests in protecting their other properties would be held paramount, and would ensure them nearby, continued dual street access.

Without a showing of wrongful acts by their codefendants, the conspiracy theories against Hall et al. are also unsupported. (*Kidron, supra*, 40 Cal.App.4th 1571, 1590.)

### D.  Wal-Mart and LSA Pleading and Ruling

#### 1.  Wal-Mart Analysis

Although the Wangs' breach of fiduciary duty claim is mainly directed toward Hall et al., it includes accompanying conspiracy allegations against Wal-Mart and LSA.  The Wangs rely on the authorization agreement as establishing that Hall et al. were acting as agents for the Wangs, and therefore owed them fiduciary duties.  Based on how the development turned out, the Wangs claim such duties were breached, with the assistance of Wal-Mart and LSA, which participated in actions that were contrary to the representations made to the Wangs in the original development application, site plan and LSA's draft traffic study.  Mainly, this claim relates to the activities of Wal-Mart's attorney Ostoich, on behalf of the Wal-Mart "team."

With respect to Wal-Mart, as outlined above, the court ruled that no actionable nondisclosures or breaches of fiduciary duty occurred, or were attributable to it through conspiracy.  As the buyer in an arm's-length transaction, Wal-Mart did not assume fiduciary duties toward the sellers.  When a codefendant owes no fiduciary duty to the plaintiff, it cannot be guilty of conspiring with another defendant who does owe such a

41

duty, to breach or assist in a breach of the duty owed only by the other. (*Kidron, supra*, 40 Cal.App.4th 1571, 1597-1598.)

Further, the Wangs had their own development team, and produced no evidence supporting their claim that they were chiefly relying upon the authorization agreement as creating fiduciary duties, on the part of the Wal-Mart development team, to protect the Wangs' proposed street access to their other parcels. We need not further discuss any alleged conspiracy liability of Wal-Mart.

### 2. *LSA Analysis*

In its oral ruling on the LSA motion, incorporated into the written order, the trial court treated LSA independently from the other defendants, addressing the fraud and fiduciary duty theories together. It first ruled that any incidental legal representation of LSA by Wal-Mart's attorney Ostoich, during a particular City hearing, did not amount to the creation of an agency of LSA for the Wangs, with regard to carrying out the authorization agreement. Rather, LSA had been hired by Hall et al. to provide a traffic study, and the evidence from the Wangs was that they did not deal with LSA individually, nor did they receive any representations from LSA about the status of the entitlement applications. LSA personnel were not shown to have been made to understand that there was any alleged agreement between Wal-Mart and the Wangs to continue the McArthur Boulevard connection to Hallmark, for the benefit of the Wangs. Accordingly, the Wangs provided no support for their agency theory or for their conspiracy theory, on either tort claim.

Since LSA was shown to be an independent contractor with a limited scope of engagement, these observations in *Kidron* are apposite: "An entity that engages in legitimate business with a party that is acting tortiously cannot be deemed a coconspirator, absent clear evidence of an agreement to join in the tortious conduct." (*Kidron, supra,* 40 Cal.App.4th 1571, 1590.) The Wangs' evidence did not controvert the LSA evidence that LSA had a limited task, preparing the traffic studies, and was not expected by anyone to deal directly with the Wangs. LSA was only a peripheral actor here. The Wangs did not qualify as principals who had the right to control the conduct of LSA, on the subject of the agency or otherwise. (*Lewis, supra*, 30 Cal.App.4th at pp. 1868-1869.)

When LSA prepared and updated its traffic studies, in coordination with the needs of Hall et al., it obviously intended that third parties would rely upon them. There was still no showing made by the Wangs that LSA had an independent duty toward them to keep them personally notified of changes in the entitlement process. The fact that the traffic studies were not further updated or disclosed did not amount to the making of " 'half truth[s]' "; "that is, when a speaker makes a representation which, though not false, he knows will be misleading absent full disclosure of additional facts known to him which qualify the initial representation." (*San Diego Hospice, supra*, 31 Cal.App.4th 1048, 1055, fn. 4.) No factual or legal basis was shown to support conspiracy liability on the part of LSA, absent any evidence showing fraud or breaches of fiduciary duties occurred on the part of Hall et al. and Wal-Mart, directed toward accomplishing some

43

improper goal that was known to LSA.  The summary judgment rulings on these tort claims were correct.

V

*ADDITIONAL BUSINESS TORT THEORIES*

A.  Inducing Breach of Contract v. Wal-Mart and Hall et al.

*1.  Applicable Legal Principles; Wangs' Pleading*

A tort action for interference with a plaintiff's contract may be brought against a third person whose acts adversely affect the plaintiff's interests.  (5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 771, p. 185; also see 5 Witkin, Summary of Cal. Law, *supra,* Torts, § 739, p. 1065.)  "[A] contracting party may not be held liable in tort for conspiracy to interfere with its own contract."  (5 Witkin, Cal. Procedure, *supra,* Pleading, § 771, p. 186.)

To obtain relief on such a theory of intentional interference with performance of a contract, a plaintiff must prove the existence of "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage."  (*Quelimane Co. v. Stewart Title Guaranty Co*. (1998) 19 Cal.4th 26, 55 [in factual context of alleged interference by a title insurer with certain contractual relations of purchasers of land and their sellers; holding the complaint sufficiently stated this cause of action]; 5 Witkin, Cal. Procedure, *supra*, § 772, p. 186; § 773, p. 188.)

44

The Wangs' theory in this respect asserts that the two Wal-Mart entities should be treated separately on this alternative claim, even though as plaintiffs, the Wangs generally believe and alleged that they had mainly common interests. The Wangs then alleged that each of these sets of defendants knew the Wang plaintiffs had valid contracts with each of the other defendants, and each defendant (respectively and intentionally), sought to induce the other defendants to breach their respective contracts with plaintiffs, causing damage.

### 2. Ruling, Contentions and Analysis: Wal-Mart

In making its ruling, the trial court stated no evidence had been produced that either of the Wal-Mart entities had interfered with the performance by Hall et al. of the authorization agreement with the Wangs and Hall et al., during the process of preparation of the development application that was eventually submitted to the City.

On appeal, the Wangs contend they made out a sufficient case for this tort, because their agreement to allow Hall et al. to protect their interests in the development process created unique duties owed to them, and the unfavorable outcome of the traffic pattern that was approved demonstrates they suffered damage, caused by Wal-Mart's interference. However, the Wangs did not produce evidence supporting their fiduciary duty claims against Hall et al., nor did they show that they had created that kind of relationship with Hall et al., such as by communicating their unique individual interests in the traffic pattern as it might affect their other parcels nearby. Instead, the evidence was undisputed that they never contacted or dealt with Hall et al. It is difficult to understand how Wal-Mart could have interfered with the Wangs' relationship with Hall, a

45

relationship that does not appear to have existed in any meaningful way. The trial court was justified in granting summary adjudication and ultimately summary judgment regarding this claim.

### 3. *Ruling, Contentions and Analysis: Hall et al.*

In its ruling, the trial court incorporated by reference its ruling on the Wal-Mart motion, as well as the related reporters' transcripts of the arguments. The court determined there were no triable issues of material fact on any cause of action pled against Hall et al.

On appeal, the Wangs again contend that under their version of the contractual duties owed to them by Wal-Mart, the unfavorable outcome of the street planning sufficiently demonstrates that Hall et al. did not act in their best interests, thus interfering with the purchase contract. However, the trial court rejected the Wangs' interpretation of the contractual duties, under both the purchase and the authorization agreements, and we have determined that ruling was well supported by the record. Wal-Mart was not in breach of contract. Therefore, the Wangs cannot show that Hall et al. failed to protect any legitimate interests that the Wangs had in the performance by Wal-Mart of the purchase contract.

### B. Intentional Interference With Prospective Economic Advantage
### (v. Wal-Mart Stores Only)

### 1. *Applicable Legal Principles; Wangs' Pleading*

For relief on a theory of intentional interference with prospective economic advantage, a plaintiff must prove the existence of " ' "(1) an economic relationship

46

between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." [Citations.]' " (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1153 (*Korea Supply*).)

This tort should be distinguished from the theory of intentional interference with a contract. In *Korea Supply*, *supra*, 29 Cal.4th 1134, 1155, footnote 7, the court states that the intent requirement is the same for the torts of intentional interference with contract and intentional interference with prospective economic advantage, but those torts nevertheless remain distinct: " '[o]ur courts should . . . firmly distinguish the two kinds of business contexts, bringing a greater solicitude to those relationships that have ripened into agreements, while recognizing that relationships short of that subsist in a zone where the rewards and risks of competition are dominant.' " (*Korea Supply, supra*, at p. 1157, quoting *Della Penna v. Toyota Motor Sales U.S.A., Inc.* (1995) 11 Cal.4th 376, 392.)

The Wangs' theory in this seventh cause of action is that one of the two Wal-Mart entities, Wal-Mart Stores, interfered with the other's purchase contract (Wal-Mart Real Estate), to the detriment of the Wangs. It is unclear how this was done, perhaps by Wal-Mart Stores' hiring of Hall et al. as civil engineers to assist in preparing the development application. This alternative claim by the Wangs is only generically asserted in boilerplate type of language.

47

## 2. *Ruling, Contentions and Analysis*

In its ruling, the trial court simply stated the Wangs' claim failed because there were "no facts pleaded or presented here to show any such interference" between the two Wal-Mart entities.

On appeal, the Wangs assert that the Wal-Mart Stores motion presented nothing but argument. However, this portion of the motion must be read in light of the related analysis regarding the other, similar causes of action against the Wal-Mart entities. Due to the correct conclusions that the trial court reached about the lack of enforceable contract duties owed to the Wangs by Wal-Mart Real Estate in this key respect (such as any exception to the "sole discretion" conferred upon the purchaser to obtain suitable entitlements for the project), it is evident that this related business tort claim has no support in the record. No third party relationship was proven. The speculative nature of this claim exists in a legal zone not known to anyone but the Wangs. (See *Korea Supply, supra*, 29 Cal.4th 1134, 1157.)

In conclusion, this record shows that the trial court conscientiously addressed each and every argument about the elements of these numerous claims, as asserted against the various defendants, and we cannot find any error in the grant of summary judgment on all theories.

DISPOSITION

Each respective defense summary judgment is affirmed.  Costs on appeal to each respective set of respondents.


HUFFMAN, Acting P. J.

WE CONCUR:


BENKE, J.


IRION, J.